Manley v. Mayer.

---

REUBEN M. MANLEY, *as Executor, etc.*, v. WILLIAM G. MAYER.

No. 13,332. (75 Pac. 550.)*

| 68 | 377 |
| p68 | 400 |
| f68 | 403 |
| f68 | 815 |
| 68 | 377 |
| e70 | 433 |
| 68 | 377 |
| 75 | 215 |

SYLLABUS BY THE COURT.

1. CONSTITUTIONAL LAW—*Attachment against Non-resident Executor.* Section 203 of the executors' and administrators' act (Gen. Stat. 1901, § 3009) authorizes the enforcement of the contract obligation of a non-resident, who died owning real estate in Kansas, by attachment and sale of such real estate in an action brought against the non-resident executor. This statute, as so construed, is not in conflict with the provisions of the state or federal consti-

*Pending in supreme court of the United States.

tutions forbidding discrimination against, or abridgment of, the privileges and immunities of citizens of other states.

2. ———— *Corporations—Dissolution Act of 1883 Held Valid.* The amendment of 1883 to section 40 of the corporation act (Gen. Stat. 1889, ¶ 1200), providing that, for the purpose of enabling creditors to prosecute actions against stockholders, a corporation should be deemed dissolved whenever it had suspended business for more than one year, was not obnoxious to the provision of the state constitution requiring the subject of an act to be expressed in its title, or to that forbidding the amendment to a section unless the new section contain the entire section as amended.

3. CORPORATIONS—*Judgment by Confession of Vice-president Held Valid.* A judgment by confession against a corporation, based upon its personal appearance by its vice-president and presiding member, and upon an affidavit made by him setting out his capacity and the facts regarding the indebtedness, will not be held void upon its face when interposed by its owner as a defense in an action brought to enforce his liability as a stockholder in the corporation.

4. ———— *Personal Relation of Vice-president to Plaintiff Immaterial.* A judgment by confession against a corporation in favor of the executor of an estate is not rendered void for all purposes by the fact that it is based upon an appearance and affidavit made by an officer who as an individual is interested in the estate as a legatee.

5. JUDGMENTS—*Death of Plaintiff— Order of Revivor Good for Five Years without Execution.* A judgment in this state becomes dormant by the death of the party. Its revivor in the name of the representative of such party restores the judgment to full force and gives it effect for the ensuing period of five years without execution, to the same extent as a revivor in the case of a judgment that has become dormant for want of an execution.

Error from Atchison district court; W. T. BLAND, judge. Opinion filed February 6, 1904. Affirmed.

*L. F. Bird,* for plaintiff in error.

*Jackson & Jackson,* for defendant in error.

The opinion of the court was delivered by

MASON, J.: William G. Mayer sued Reuben M. Manley, as executor of the will of George Manley, deceased, under the provisions of sections 1200 and 1204

of the General Statutes of 1889 (now repealed), author-
izing creditors of dissolved corporations to bring ac-
tions against stockholders upon their individual
liability, and recovered a judgment, which the de-
fendant seeks to reverse.   George Manley, a resident
of New Jersey, died owning real estate in Kansas and
jurisdiction was obtained by attaching this property
as that of the executor, also a non-resident.   This was
done under the authority of section 3009, General
Statutes of 1901, which reads :

"An executor or administrator duly appointed in
any other state or country may sue or be sued in any
court in this state, in his capacity of executor or ad-
ministrator, in like manner and under like restrictions
as a non-resident may sue or be sued."

It is claimed that this statute was only intended to
authorize a non-resident executor to be sued as a resi-
dent executor might be ; that a creditor
of the estate of a decedent, however his
claim may be established, can only col-
lect it by sharing in due proportion with

1. Attachment
against non-resi-
dent executor
held constitu-
tional.

other creditors in the proceeds of an orderly adminis-
tration under the direction of the probate court, and
not by seizing and selling specific property ; that the
title to the real estate was in the devisees under the
will, not in the executor, and that it could not be
levied on under process against the latter.   These
arguments would appeal to the court with much force
if the questions presented were new.   But they are
not.   They have been determined adversely to the
contentions of plaintiff in error in a series of decisions
by this court commencing with *Cady v. Bard*, 21 Kan.
667, decided in 1878.   (See *Manley v. Park*, 62 Kan.
553, 64 Pac. 28, and cases there cited.)

So far as it relates to the interpretation of the

statute this consideration should be conclusive. A judicial construction placed upon its language by a united court, over a quarter of a century ago, and repeatedly affirmed without dissent, must be deemed to have received the sanction of legislative approval. Granting that the court in the first instance mistook the purpose and intent of the act, there has been so abundant opportunity for the lawmaking power to give further expression to its will that its failure to act amounts to a ratification. With respect to the validity of the law, as so construed and accepted, the weight to be given the earlier decisions is less controlling and depends upon the force of the reasoning by which they are supported.

It is urged that under the construction given it the statute conflicts with section 17 of the Kansas bill of rights, with section 2 of article 4 of the federal constitution, and with the fourteenth amendment to it, in that it makes a distinction between citizens of Kansas and those of other states, denying to the latter privileges and immunities of the former, and depriving them of property without due process of law. The statute is an unusual one. It originated in this state at the time of the revision of 1868, when the chapter regarding executors and administrators was adopted from Ohio. The corresponding section there (Rev. Stat. Ohio, 1860, vol. 1, ch. 43, § 236) provided only for suits by, not against, foreign executors and administrators. It was transplanted with only so much change of language as authorized them to be sued, as well as to sue, "in like manner and under like restrictions as a non-resident."

If any similar provision exists elsewhere, its validity seems not to have been drawn in question. The territory of Washington formerly had a statute expressly

authorizing the attachment of the property of non-resident executors, but it was repealed before being passed upon, although it was referred to in *Barlow & Shepherd v. George Coggan*, 1 Wash. Ter. 257. In *Craig v. Railroad Co.*, 2 Ohio N. P. 64, the constitutionality of a statute authorizing non-resident executors to be sued was affirmed, the opinion citing *Cady v. Bard*, supra. The same case is cited with approval in Woerner's American Law of Administration, volume 1, section 163, and in Reno on Non-residents, section 59, where it is said :

"There seems to be no doubt that a state is not restrained by the national constitution from authorizing suits to be brought in its courts against foreign executors and administrators ; and that service of process, by attachment of property within its jurisdiction, and notice by publication to the non-resident foreign executor or administrator, in accordance with the local statute, will confer jurisdiction over such property and will justify its sale upon execution. . . . Such statutes seem to be eminently just and proper. They afford an easy means of preventing the withdrawal of local assets before the claims of local creditors have been satisfied. Local creditors can protect themselves by the simple process of attachment and publication. Their constitutionality seems clear. Such state process is not contrary to due process of law, as against the defendant's title to the property attached, even if he does not appear in the proceedings ; for the preliminary attachment and publication subject the property to the control and jurisdiction of the court, which is therefore authorized, upon due proof of the plaintiff's claim, to order its sale, and thereby to divest the title of the non-resident defendant."

In *Manley v. Park*, 62 Kan. 553, 64 Pac. 28, the question of the constitutionality of the statute was discussed to some extent, but not definitely passed

upon for the reason that it was treated as not having been raised before judgment. It was sought to have this case reviewed by the United States supreme court, but the judgment was there affirmed on the same ground. (*Manley v. Park,* 187 U. S. 547, 23 Sup. Ct. 208, 47 L. Ed. 296.)

The claim is made that the statute discriminates against the non-resident executor in three ways : (1) In permitting suit to be brought against him in the district court, whereas resident executors can only be sued in the probate court; (2) in permitting specific assets under his control to be segregated for the benefit of a particular creditor, whereas resident executors are allowed to apportion the proceeds of the property equitably among all the creditors; (3) in permitting him to be sued in attachment, upon no other ground than that he is a non-resident. The first contention is unsound in fact. The resident executor, like the non-resident, may be sued in the district court. (Gen. Stat. 1901, § 2891.) The second contention seems based upon solicitude for the rights of other creditors rather than for those of the executor. Non-resident creditors are afforded the same privilege of attachment as resident. Whether in a controversy between two attaching creditors the ordinary rules of priority would be affected by the consideration that the property was a part of the estate of a decedent is not a matter to be inquired into at the instigation of the executor. The only issue as to him relates to cutting off his title and subjecting the property to the payment of the debts sued on, if found to be valid. In Tennessee an attachment may be had " where any person liable for any debt or demand, residing out of the state, dies, leaving property in the state." (Code 1896, § 5211.)

It was held in *Bacchus v. Peters*, 85 Tenn. 678, 681, 4 S. W. 833, that

"The statute was intended to afford the creditor a simple and speedy remedy for the collection of his debt where administration was not granted — too expensive or unnecessary — but was not intended to provide a method by which one creditor might by diligence obtain priority. In cases where there are no other creditors, or where none intervened, and no insolvency exists or is suggested, and proper defense interposed before the final appropriation of property attached, the statute would operate for effectual relief of the attaching creditor alone."

The reason for the rule that an executor cannot (without statutory authority) sue in a foreign jurisdiction is said to be "the protection of local creditors who might be injured by permitting the withdrawal of the assets and compelling them to resort to a foreign jurisdiction to obtain satisfaction of their claims." (13 A. & E. Encycl. of L., 2d ed., 948.)

"That this is the ground on which the rule is enforced is shown by the cases on ancillary administration, which uniformly hold that the duty of the ancillary administrator here is to account to domestic creditors, and, after they are satisfied, to pay over the balance to the primary or domiciliary administrator." (*Laughlin & McManus, Appellant, v. Solomon*, 180 Pa. St. 177, 36 Atl. 704, 57 Am. St. Rep. 633.)

"Every sovereign has his own code of administration, varying to infinity as to the order of paying debts; and almost without an exception, asserting the right to be himself first paid out of the assets." (*Smith, Administrator, v. Union Bank of Georgetown*, 5 Pet. 518, 526, 8 L. Ed. 212.)

"By the administration law, foreign executors and administrators may sue and be sued in this state, like those of our own appointment; thereby, in most cases, making it unnecessary that any ancillary administra-

tion should be instituted." (*Swearingen v. Morris*, 14 Ohio St. 424, 431.)

The Ohio statute referred to, relating to ancillary administration, provided:

"The proceeds of such assets shall be applied to the payment of the debts which shall be proved against such estate before such administrator, . . . and the surplus, if any, shall be paid into the court granting such administration for the benefit of the estate of such decedent; in the state where the decedent resided at the time of his death." (1 S. & C. Stat. 1860, ch. 43, § 260.)

"A judgment against an administrator is, in legal effect, an adjudication subjecting the assets within the jurisdiction of the court to the satisfaction of the claim in suit." (*Burton v. Williams*, 63 Neb. 431, 88 N. W. 765.)

"It is a settled rule of law of this state that a domestic creditor of a non-resident decedent will not be compelled to go to a foreign jurisdiction if there be property here which can be applied to the satisfaction of his claim. We, therefore, assume the right to administer the property here for the benefit of domestic creditors, and to impress upon it a lien or trust for their benefit." (*Montgomery v. Boyd*, 78 Hun, App. Div. 64, 72, 79 N. Y. Supp. 879, 885.)

These citations and quotations sufficiently show the general acceptance of the doctrine that it is competent for the legislature by appropriate action to subject such property of a decedent as is located within the state to the payment of creditors who see fit to resort to the courts of that state. This, so far as relates to the complaints here made, is all that the statute under discussion attempts. The particular legal machinery by which this result is accomplished is not a matter of concern to the foreign administrator. "It was obviously not a right, privilege or immunity

of a citizen of the United States to have a controversy in the state court prosecuted or determined by one form of action instead of by another." (*Iowa Central Railway Company v. Iowa*, 160 U. S. 389, 16 Sup. Ct. 344, 40 L. Ed. 467.)

With regard to the third contention, that it is an unlawful discrimination to allow an attachment to issue against a non-resident and not against a resident executor, no reason is perceived (other than those already considered) for distinguishing this question from that arising upon the usual statute authorizing the attachment of the property of a non-resident for the very reason that he is a non-resident. In either case the proceeding is in fact a mere device for obtaining jurisdiction of the property for the purpose of applying it to the payment of debts, there being no way by which personal jurisdiction of the non-resident may be obtained. (*Dillon v. Heller*, 39 Kan. 599, 18 Pac. 693.)

"No one ever dreamed that the attachment laws of the several states, authorizing attachments against non-resident defendants, were violative of the constitution of the United States." (*The Pyrolusite Manganese Company v. Ward*, 73 Ga. 491.)

"The constitutional provisions are not violated by a statute which allows process by attachment against a debtor not a resident of the state, notwithstanding such process is not admissible against a resident." (Cool. Const. Lim., 7th ed., 574.)

In *Central Loan and Trust Co. v. Campbell*, 173 U. S. 84, 97, 19 Sup. Ct. 346, 43 L. Ed. 623, it was said:

"The only remaining contention to be considered is the claim that the territorial statute authorizing the issue of an attachment against the property of a non-resident defendant in the case of an alleged fraudulent disposition of property is repugnant to the fourteenth

25—68 KAN.

amendment to the constitution of the United States and in conflict with the civil rights act. The law of the territory, it is said, in case of an attachment, for the cause stated, against a resident of the territory requires the giving of a bond by the plaintiff in attachment as a condition for the issue of the writ, whilst it has been construed to make no such requirement in the case of an attachment against a non-resident. This, it is argued, is a discrimination against a non-resident, does not afford due process of law, and denies the equal protection of the laws. The elementary doctrine is not denied that for the purposes of the remedy by attachment, the legislative authority of a state or territory may classify residents in one class and non-residents in another, but it is insisted that where non-residents are not capable of separate identification from residents by any facts or circumstances other than that they are non-residents—that is, when the fact of non-residence is their only distinguishing feature—the laws of a state or territory cannot treat them to their prejudice upon that fact as a basis of classification. When the exception, thus stated, is put in juxtaposition with the concession that there is such a difference between the residents of a state or territory and non-residents, as to justify their being placed into distinct classes for the purpose of the process of attachment, it becomes at once clear that the exception to the rule, which the argument attempts to make, is but a denial, by indirection, of the legislative power to classify which it is avowed the exception does not question. The argument in substance is that where a bond is required as a prerequisite to the issue of an attachment against a resident, an unlawful discrimination is produced by permitting process of attachment against a non-resident without giving a like bond. But the difference between exacting a bond in the one case and not in the other is nothing like as great as that which arises from allowing processes of attachment against a non-resident and not permitting such process against a resident in any case. That the distinction between a

resident and a non-resident is so broad as to authorize
a classification in accordance with the suggestion just
made is conceded, and, if it were not, is obvious.
The reasoning then, is, that, although the difference
between the two classes is adequate to support the
allowance of the remedy in one case and its absolute
denial in the other, yet that the distinction between
the two is not wide enough to justify allowing the
remedy in both cases, but accompanying it in one in-
stance by a more onerous prerequisite than is exacted
in the other.   The power, however, to grant in the
one and deny in the other of necessity embraces the
right, if it be allowed in both, to impose upon the
one a condition not required in the other, for the
lesser is necessarily contained in the greater power.
The misconception consists in conceding, on the one
hand, the power to classify residents and non-resi-
dents, for the purpose of the writ of attachment, and
then from this concession, to argue that the power
does not exist, unless there be something in the cause
of action, for which the attachment is allowed to be
issued, which justifies the classification.   As, how-
ever, the classification depends upon residence and
non-residence, and not upon the cause of action, the
attempted distinction is without merit.''

Prior to 1883 it was provided by section 44 of the
corporation act (Gen. Stat. 1868, ch. 23) that credit-
ors might sue the stockholders of a *dissolved* corpora-
tion upon their individual liability, and by section 40
it was provided how a corporation might be dissolved.
In 1883 (Laws 1883, ch. 46) this section 40 was
amended by adding a provision that a corporation
should be "deemed to be dissolved"
2. Dissolution act of 1883 held constitutional. for the purpose of enabling creditors to
sue stockholders whenever it had ceased
to do business for more than one year.   (Laws 1883,
ch. 46, § 1.)   It is claimed by plaintiff in error that
this amendment is void because enacted in violation
of section 16 of article 2 of the Kansas constitution,

relating to the title of acts and requiring amendments to sections to contain the entire section amended. It is argued that under color of amending section 40 the legislature really attempted to amend section 44; that the new matter added to the statute had no reference to the subject of when or how a corporation is dissolved, but merely gave a new remedy to creditors against stockholders. The substance of the argument is that the situation is the same as though the legislature had attempted to accomplish the purpose intended by directly enacting that section 44 should be amended by adding certain words thereto without incorporating into the new act the provisions of the section already existing. This course would obviously have been within the letter and reason of the constitutional prohibition. But the answer to the argument is that while the legislature might properly have reached the desired end by amending section 44 in set terms, incorporating the old section with the amendment into a new one, or might have improperly attempted this by the course suggested, it in fact chose another method and in due form amended section 40.

It is not true that the new matter had no relation to the subject of the dissolution of the corporation. If the new conditions prescribed as authorizing a suit against the stockholders had in fact no relation to the matter of the dissolution of the corporation, and the legislature had sought arbitrarily to classify corporations as dissolved under circumstances manifestly not justifying such a term, a very different question would be presented. But there is no impropriety in calling a corporation dissolved when it has ceased for a year to do the business for which it was created. Nor is there anything inconsistent in providing that

a corporation may be at the same time dissolved for certain purposes and not dissolved for others.

It is further objected that the action will not support an attachment because not founded on contract. It has repeatedly been held, however, that the liability sued upon is contractual. It is also claimed that the bonds of the corporation that formed the basis of the suit were void because not authorized by its charter. They purported to be issued for existing obligations of the company and were certainly not void upon their face. Complaint is also made that the trial court permitted plaintiff to introduce in evidence a pleading filed by defendant in another action in which certain facts were admitted for the purpose of such action only. If this was error it was not material, since the trial was had without a jury, and there was competent evidence upon the only issue affected sufficient to support the finding of the court.

The objections so far considered relate to the right of plaintiff to maintain the action at all, and upon all such objections our holding is against the plaintiff in error. But other questions are presented relating to the amount of recovery and to matters which defendant claimed should limit the total amount of his liability to corporate creditors. The most important of these concerns a judgment held by him against the corporation, which was first allowed, but afterward disallowed by the trial court, as a limitation upon his liability. The judgment was rendered upon confession and the objections made to it are three : (1) That the statute relating to judgments by confession was not complied with and the judgment was therefore a nullity ; (2) that it was rendered in favor of an executor upon a confession made by an officer assuming to act for the corporation, who as an individual was

a beneficiary of the act, in that he was one of the dis‾ tributees of the estate represented by the executor ; (3) that the judgment had become dormant and so was· unavailable for any purpose.

The first objection turns upon the fact that the judgment was founded upon the personal appearance of the corporation in court by R. M. Manley, its "vice-president and presiding member," and upon an affidavit ·made by him. The statutory provisions relating to judgment by confession (Code, §§ 402–405 ; Gen. Stat. 1901, §§ 4851–4854) are as follows :

3. Judgment by confession of vice-president held valid.

· "SEC. 402. Any person indebted, or against whom a cause of action exists, may personally appear in a court of competent jurisdiction, and with the assent of the creditor or person having such cause of action, confess judgment therefor ; whereupon judgment shall be entered accordingly.

"SEC. 403. Judgments may be entered upon confession by an attorney authorized for that purpose by a warrant of attorney, acknowledged or proved as conveyances of land, without any previous process or proceeding ; and judgments so entered shall be a lien from the date of entry.

· "SEC. 404. The debt or cause ·of action shall be briefly stated in the judgment, or in writing, to be . filed as pleadings in other actions.

. "SEC. 405. Before any judgment shall be entered by confession, an affidavit of the defendant must be filed, stating concisely the facts on which the indebted ness arose, and that the amount of such indebtedness is justly due and owing by the defendant to the plaintiff."

The proceeding in question was had under the first section quoted, without the use of a warrant of attorney. · It is objected that a corporation cannot personally appear, within the meaning of this section, and that if it can the vice-president or presiding

member has no authority by virtue of his office to make such appearance in its behalf.   In *Chamberlin v. Mammoth Mining Co.*, 20 Mo. 96, it was said that the president, "being the person appointed by law to defend the corporation, was competent to confess the action.   He might have suffered a judgment by default, and the matter is not made worse by an appearance and confession."   This reasoning seems sound and applicable to any officer upon whom service might be had.   (*Bank v. Prescott*, 60 Kan. 490, 57 Pac. 121.) The statute allows service of summons against a corporation to be made upon its "president, mayor, chairman of the board of directors, or trustees, or other chief officer."   (Gen. Stat. 1901, § 4498.) Cases are cited in *Debenture Co. v. Lombard*, 66 Kan. 251, 71 Pac. 584, holding that service may be made upon a vice-president.   The offices of vice-president and presiding member are recognized by the statute (Gen. Stat. 1901, § 1308) authorizing either to execute a deed.   Manley might in either capacity (with the addition of the common seal) have made a sufficient power of attorney to enable some one else to confess judgment for the corporation.

It is to be borne in mind throughout this discussion that the attack upon the judgment is not only collateral—it is made by one occupying no more advantageous ground than the defendant itself.   As between the parties a judgment by confession may be good, notwithstanding a failure to comply fully with the statute.   (*Smith v. The State*, 64 Kan. 730, 68 Pac. 641, and cases cited; also, *U. P. Railway Co. v. McCarty*, 8 Kan. 125.)   If this judgment was a valid claim against the corporation no reason is apparent, in the absence of any charge of fraud, why its owner might not interpose it in reduction of his liability as

a stockholder when sued for a corporate debt. The affidavit in verification of the pleading of a corporation is merely required to be made by some officer. (Code, § 110; Gen. Stat. 1901, § 4544.) If a manifestly bad service were made upon a defendant corporation and an answer were filed in its behalf, verified and signed only by some officer other than the president, could the corporation be heard after judgment to say that the court had no jurisdiction? Here the corporation's officer made and filed an affidavit required by the statute, setting out his official capacity. This was tantamount to a pleading in an ordinary action. It was verified according to the provisions of the code. It was legal evidence of its contents, which included a statement of the facts occasioning the indebtedness and authorizing a judgment. No question of fact is raised either as to the validity of the debt or as to the actual authority of the officer to represent the company. We cannot say that under these circumstances, and as against the attack here made upon it, the judgment was upon its face utterly void.

It is claimed that the second objection to the judgment, based upon the fact that Manley was a beneficiary of the plaintiff's trust, is substantially the same as that held to be good in *Manley v. Larkin*, 59 Kan. 528, 53 Pac. 859.

4. Personal relation of vice-president to plaintiff immaterial.

There an insolvent debtor confessed judgment against himself in favor of an estate in which he was interested as a devisee. This was attacked by another creditor, and it was held void as to him because it resulted in a secret trust in favor of the debtor by giving him a lien on the real estate to the prejudice of other creditors. Here the situation is very different. The attack is not made by another creditor, nor by any one similarly situated or having

equivalent equities. The feature of that case upon which the decision turned was that the confession of judgment by creating a lien became substantially a mortgage. Here the matter of the creation of a lien was not involved, and indeed the judgment was no more effective for the purpose for which it is here invoked than the debt upon which it was based would have been, if valid, while there the validity of the claim was immaterial. Again, in that case the debtor confessed a judgment against himself in favor of himself and thereby in effect conveyed property to himself as security. Here he acted merely as an agent for a corporation. His acts under such circumstances are subject to the keenest scrutiny, but it cannot be said that they are under all circumstances absolutely void. "Whenever an agent, in acting for his principal, also deals with himself, . . . such dealings will be held to be valid unless the principal chooses to hold them invalid. Such dealings are not void, but only voidable at the option of the principal." (*Barr v. Randall*, 35 Kan. 126, 130, 10 Pac. 515. See, also, *Bank v. Milling Co.*, 59 id. 654, 54 Pac. 681.) We hold that the judgment is good against this objection.

The third objection made to the judgment is that it had become dormant by plaintiff's permitting five years to elapse without suing out an execution, and that this condition had existed for more than a year, so that the judgment was absolutely barred for all purposes. In reply to this it is said that before the expiration of five years from the date of the judgment the representative powers of William H. Risk, the judgment plaintiff, having ceased, the judgment had been duly revived in the name of his successor, Reuben M. Manley, and

5. Revivor good for five years without execution.

that at the time the pleadings were settled five years had not elapsed since then. This presents the question whether, when a judgment is revived by reason of the death of a party or the cessation of his powers, such revivor affords a new starting-point and makes the judgment good for five years more without further revivor or execution. On the one hand, it is argued that the judgment had once become dormant and had been revived, and that it could not become dormant again except for causes accruing wholly after such revivor; on the other, that a judgment does not become dormant by the death of a party or the cessation of his powers, and that the substitution of a new party in lieu of one who has died or whose powers have ceased is not a revivor. The latter view has heretofore been urged upon the court in several cases, an especially elaborate discussion of it having been presented in the brief of plaintiff in error in *Johnson v. Wynne*, 64 Kan. 138, 67 Pac. 549, which was reversed upon considerations foreign to this matter.

The subject of the dormancy and revivor of judgments has given rise to much discussion and disagreement. The decisions in this state have departed radically from the law as construed elsewhere even under similar statutes. Section 425 of our code (Gen. Stat. 1901, § 4875) provides that on the death of a party to an action it may be revived in the name of his representative, but only if the order therefor is made within a year (Code, § 433; Gen. Stat. 1901, § 4883); that if a judgment becomes dormant it may be revived in the same manner (Code, § 440; Gen. Stat. 1901, § 4890); that if either party to a judgment dies his representative may be *made a party to it* in the same manner as is prescribed for reviving actions (Code, § 439; Gen. Stat. 1901, § 4889). This last proceeding is not in so many

words described as a revivor, but it is uniformly so designated in the decisions both in this state and elsewhere.   A more significant fact is that the statute does not undertake to define dormancy and does not apply the term to the condition arising upon the death of a party to a judgment.   But in Kansas (as perhaps in no other jurisdiction) such condition is constantly spoken of as dormancy, and a long line of decisions have assimilated this condition to that of a judgment dormant for want of the timely issuance of execution, until they must be regarded as practically identical.   It has been held that a judgment dormant for want of execution must be revived, if at all, within the year (*Angell v. Martin*, 24 Kan. 334), and that this is true of a judgment a party to which has died (*Scroggs v. Tutt*, 23 Kan. 181) ; that after the year has passed without revivor neither judgment will support an action (*Mawhinney v. Doane*, 40 Kan. 676, 17 Pac. 44; *Smalley v. Bowling*, 64 id. 818, 68 Pac. 630).   In the last-cited case it was recognized that all of these decisions, and many others of like nature, are at variance with the current of authority elsewhere, but the majority of the court held that it was too late to attempt to conform to the practice in other jurisdictions.

The analogy between the situation arising upon the death of a party to a judgment and the condition ordinarily known as dormancy must be determined in the light of the construction already given these statutes by this court.   It is not clear whether the word "dormant," as applied to judgments, had originally or has ordinarily a well-defined technical meaning, but here it has by repeated use been given a definition broad enough to cover judgments that have not wholly lost their vitality, but which cannot support an exe-

cution for want of necessary parties. In *Kothman v. Skaggs*, 29 Kan. 5, 17, it was said of a judgment, after the death of the defendant :

"The judgment then ceased to be a judgment against any living person, but it did not become a nullity ; it was still a judgment in a limited sense. It was a judgment in abeyance, a dormant judgment."

In *Ashmore v. McDonnell*, 16 Pac. (Kan.) 687, 690, the term was applied to a judgment against one afterward sentenced to the penitentiary for life, and therefore civilly dead. It was said :

"This conviction deprived the plaintiff of all civil rights, and, before an execution could be issued thereon, this judgment would have to be revived. *Commissioners, etc., v. Lawrence*, 29 Kan. 158. This not having been done, the execution was issued upon a dormant judgment, and was of no validity."

This language was omitted from the final opinion as officially published (39 Kan. 669), but only in view of new facts developed, not because the statement of law was doubted. It was quoted with approval in *Seeley v. Johnson*, 61 Kan. 337, 59 Pac. 631, where it was also said (page 339) : "Upon the death of the plaintiff in the judgment at bar it became dormant." In *Mawhinney v. Doane*, 40 Kan. 676, 680, 17 Pac. 44, 48, it was said :

"The judgment sued on is dormant, and the time has expired within which it can be revived. This dormancy was created by the death of Sarah F. Mawhinney."

These cases sufficiently illustrate the proposition stated that, whatever may be the rule elsewhere, in Kansas the death of a party renders a judgment dormant within the meaning of the statute. When a judgment, dormant because of the lapse of five years

Manley v. Mayer.

without an execution, is revived, it cannot be doubted that such revivor restores life to it and makes it good for five years without the issuance of an execution. It is not a new judgment, but it has been reanimated, restored to activity, and made as effective as ever.   So if a party to such a dormant judgment should die and a revivor be had in the name of his representative within a year from the occurrence of the first dormancy, this would obviously cure the dormancy occasioned by the want of execution as well as that resulting from the death.   The proceedings in the two cases are alike and the orders substantially the same, and when the judgment is dormant only because of the death of a party the order of revivor should be equally effective.

We think this view harmonizes with all the actual decisions that have heretofore been made by this court, and with the language used in support of them, except in part in the case of *Halsey v. Van Vliet*, 27 Kan. 474.   There the only question before the court was whether, under the facts of that case, the judgment involved was a lien on certain real estate, and it was decided that it was not.   The judgment was rendered February 18, 1873.   On April 18, 1873, the defendant conveyed the land in question to a third party.   On April 28, 1873, the defendant died, and on May 19, 1873, an administrator was appointed. On October 11, 1875, by the consent of the administrator, the judgment was revived.   Since the judgment could at that time be revived only by consent, it is obvious, under the authority of *Schmucker v. Sibert*, 18 Kan. 104, 26 Am. Rep. 760, that it could not be made a lien on the land without the consent of the owner; the consent of the representative of the defendant, who had parted with the title, was not suffi-

cient.    Mr. Justice Brewer, in discussing the effect
of executions issued after the death of a party and be-
fore revivor, expressed his own views as follows :

"The writer believes that so far as affects the ques-
tion of keeping alive the judgment, those executions
cannot be considered nullities.   While doubtful whether
a sale under them could be upheld, even when col-
laterally attacked, and conceding that such a sale
would be voidable and would be set aside upon a
motion or other direct proceeding, he holds that this
result follows alone from the fact that there is no party
defendant in being whose property can be seized.   He
believes that the principle upon which the issue of an
execution keeps alive a judgment is, that thereby the
plaintiff affirms its vitality, and that this principle is
enforced whenever the plaintiff comes into court and
causes an execution to be issued and placed in the
hands of an officer, and that it is immaterial whether
the defendant then has any property upon which the
process may be levied, or whether by the death of the
defendant there be any party in being against whom
the process may lawfully run.   It is in either case
equally an assertion by the plaintiff that the judgment
is unpaid, and that he is intending at some time and
in some way to enforce its collection."    (Page 481.)

The court held this reasoning to be inapplicable
for the reason that the executions were absolute nul-
lities and that "when an execution is void the causing
it to issue cannot be regarded as a proceeding in good
faith to collect the judgment."    A valid order of re-
vivor, on the contrary, is the highest form of affirm-
ance that the judgment is unpaid, since it amounts to
a judicial determination to that effect at the instance
of plaintiff and upon notice to defendant.    We hold
that the judgment was not dormant at the time the
answer was filed.

It is further argued that the revivor was void be-
cause made upon only five days' notice.    The statute

requires only a reasonable notice (*Coal Co. v. Carey*, 65 Kan. 639, 70 Pac. 589), and it cannot be said, as a matter of law, in a collateral attack, that this notice was not sufficient.

Two other demands of the defendant against the corporation were disallowed by the trial court. It is said by plaintiff in error that this was because they had outlawed between the time of the filing of the petition and the filing of the answer, and the question is argued at length whether, for the purposes here involved, the commencement of this action should be deemed to stop the running of the statute of limitations against these claims. It is at least doubtful whether plaintiff was in a situation to avail himself of this consideration. However, neither of these questions needs to be determined. It appears that the claims were based upon guaranties made by the corporation, its obligation being secondary, and there is no such showing of diligence exercised against the principal obligor as to charge it absolutely. On the contrary, the negligence shown seems such as to discharge the corporation altogether. The ruling of the trial court in disregarding these claims is approved, not because action upon them against the corporation was barred, but because it was not shown that a cause of action upon them ever accrued against it.

The conclusions here reached will not affect the final judgment in this particular case, which is one of a series of the same character, but the additional deduction to be allowed defendant will diminish his total liability, and require the reversal of one of the judgments and the modification of another.

This judgment is accordingly affirmed.

All the Justices concurring.