THE STATE OF KANSAS, *ex rel. C. C. Coleman, as Attorney-general*, v. THE INTERNATIONAL HARVESTER COMPANY·OF AMERICA.

No. 15,950.    (99 Pac. 603.)

SYLLABUS BY THE COURT.

1. WORDS AND PHRASES—*"Actions."* The word "actions," as used in section 1261 of the General Statutes of 1901, includes both civil and criminal actions as defined in the code of civil procedure.

2. —— *"Process."* The word "process," as used in the statute above mentioned, includes writs used in both civil and criminal actions for bringing parties into court.

3. MONOPOLIES—*Information.* An information, drawn under the antitrust laws of this state, wherein the offenses charged consist of many sales of commodities made in violation of section 2435 of the General Statutes of 1901, is not fatally defective because in its introductory statement several combinations, associations, trusts and corporations are mentioned generally, of which the defendant is averred to have been a member when the alleged sales were made.

4. —— *Hearsay, Testimony—Admissions by a Corporation Officer.* Upon the trial of a defendant under an information similar to the one mentioned in paragraph 3 the state, for the purpose of sustaining the averment that the defendant was a member of an unlawful combination when the alleged sales were made, produced a witness who heard the president of the defendant corporation deliver an address, and the witness was permitted to repeat statements made in such address. At the time this address was delivered the defendant had been but recently organized, and was then entering upon its first year's business. The defendant was engaged in the manufacture and sale of all kinds of harvesting machinery, and was prepared to transact a large business, having a capital of $1,000,000, and an immense quantity of merchandise on hand. The address was delivered to a meeting composed of local agents and dealers in harvesting implements from the states of Missouri, Kansas, Oklahoma, and Colorado, who had been called together for the purpose of consulting about matters concerning the trade in such implements generally, and particularly about the defendant, a new company supposed to be of unusual strength and capacity, but not well known. To obtain reliable information about the defendant its president was invited to deliver an address to the meeting upon that subject. The invitation was accepted and the address delivered. In this address the speaker stated that the combination of which the defendant was a member had obtained control of ninety-five per cent. of the capital used in the manufacture of harvesting machinery, and a majority of the companies heretofore engaged in that business were already in the combination, and they hoped to get the remainder; that the company expected to make prices uniform, and so manage the business that both the companies and their agents would make more money than they had done. *Held,* that the admission of such evidence was not error.

5. ——— *Information—Number of Offenses Charged—Waiver.* In an information similar to the one mentioned in paragraph 3 the sales charged against the defendant were alleged separately, each in a different count. Several counts, however, averred the sale as of the same date, with nothing to indicate whether they were made in the same transaction or not. No question was raised as to this defect during the trial, unless by the motion to quash, in which the grounds stated read: "The information is so uncertain that the defendant can not plead thereto; the offenses are not stated with certainty." The evidence shows that the sales were separate and distinct transactions. The trial proceeded apparently upon the theory that the sales were separate. Each sale was established by the same evidence. Toward the close of the trial the claim was presented for the first time, by requests for special instructions to the jury, that the several counts charged but one offense, which instructions were refused. It does not appear that the defendant was prejudiced thereby. *Held,* not error.

Appeal from Shawnee district court; ALSTON W. DANA, judge. Opinion filed January 12, 1909. Affirmed.

*Fred S. Jackson,* attorney-general, and *John S. Dawson,* assistant attorney-general, for The State; *A. M. Harvey,* and *C. C. Coleman,* of counsel.

*W. E. Stanley, B. P. Waggener, R. R. Vermilion,* and *Earle W. Evans,* for appellant; *Edgar A. Bancroft,* of counsel.

The opinion of the court was delivered by

GRAVES, J.: On October 13, 1906, the attorney-general filed an information in the district court of Shawnee county charging the International Harvester Company of America with having violated the antitrust laws of this state. The information contained seventy-five counts. The defendant is a foreign corporation, having its headquarters in Chicago, Ill. Service was obtained upon it both by warrant and summons. These were served through the office of the secretary of state, under the provision of the statute relating to civil actions. Mo-

tions to quash the writs and the service thereof were duly made and denied. The defendant then entered a plea of not guilty, and on December 2, 1907, the trial began before the court and a jury. The jury returned a verdict of guilty upon forty-two of the counts, and not guilty as to the remainder. Upon this verdict the court assessed a fine against the defendant of $300 upon each count, making an aggregate sum of $12,600. Motions in arrest of judgment and for a new trial were denied. The defendant appeals to this court, and asks that the judgment of the district court be reversed. Many questions have been presented, each of which has been earnestly insisted upon, and they will be considered in the order presented.

The first question raised is that the court did not obtain jurisdiction of the defendant. This involves an examination of the statute under which service was made. When the defendant obtained permission to do business in this state it, in compliance with section 1261 of the General Statutes of 1901, filed its consent that *actions* might be commenced against it by service of *process* upon the secretary of state, which service should be as binding and valid as if served upon its president or other chief officer. That statute, so far as applicable to this question, reads:

"Each application for permission . . . to engage in business in this state as a foreign corporation . . . by corporations organized under the laws of any other state, territory, or foreign country, and as a condition precedent to obtaining authority to transact business in this state, said corporation shall file in the office of the secretary of state its written consent, irrevocable, that actions may be commenced against such corporation in the proper court of any county in this state in which the cause of action arose, or in which the plaintiff may reside, by the service of process on the secretary of state, and stipulating and agreeing that such service shall be taken and held in all courts to be as valid and binding as if due service had been made upon the president or chief officer of such corporation."

To carry out the provisions of this section it is provided in section 1262 of the General Statutes of 1901:

"The summons shall be directed to the secretary of state, and shall require the defendant to answer by a certain day, not less than forty days nor more than sixty days from its date. Said summons shall be forthwith forwarded by the clerk of the court to the secretary of· state, who shall immediately forward a copy thereof to the secretary of the corporation sued; and thereupon said secretary of state shall make return of said summons to the court whence it issued, showing the date of its receipt by him, the date of forwarding such copy, the name and address of the person to whom he forwarded said copy, and the costs for service and return thereof."

After filing the information in the district court a paper called a "summons" was issued, which was in the ordinary form of a summons in a civil action, describing in general terms the nature of the accusation in the information. This summons was directed to the secretary of state, receipt of which was acknowledged in his name, signed by the assistant secretary, and it was returned in due form, showing that it had been forwarded to the secretary of the defendant. A paper in the form of a warrant was also issued and directed to the sheriff of Shawnee county, who delivered it to the secretary of state, who sent it to the secretary of the defendant, the same as was done with the summons. Did this give jurisdiction to the court over the defendant? The defendant is a foreign corporation. In pursuance of the permission given by the state, as above stated, it transacted business in this state, and, while so doing, committed the acts charged against it. We think it is bound by the consent given that it might be prosecuted in the courts of this state.

The object of requiring such consent is to avoid any difficulty in obtaining jurisdiction over the corporation in the courts of this state for the purposes of any litigation which may arise between the corporation and the state or its citizens while such corporation enjoys

the privilege conferred. The transaction under which 'this permission was obtained should be interpreted liberally for the purpose of promoting this manifest object. The statute which provides for such consent, in designating the proceedings whereby the presence of the corporation may be secured in the courts of this state, uses the word "actions." This word at the time the statute was enacted had a well-defined meaning given by the law of this state, and was evidently used advisedly and in that sense. The civil code contains these provisions:

"Remedies in the courts of justice are divided into, first, actions; second, special proceedings.

"An action is an ordinary proceeding in a court of justice by which a party prosecutes another party for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense.

"Every other remedy is a special proceeding.

"Actions are of two kinds—first, civil; second, criminal.

"A criminal action is one prosecuted by the state as a party against a person charged with a public offense, for the punishment thereof.

"Every other is a civil action." (§§ 3-8.)

The word "actions," as used in section 1261 of the General Statutes of 1901, applies to both civil and criminal actions, and, as we think, covers this prosecution. The paper, by the service of which jurisdiction was sought to be obtained, whether called warrant or summons, was *process,* and this is the word used in the statute. Volume 2 of Bouvier's Law Dictionary defines this word to mean "a writ, warrant, subpoena, or other formal writing issued by authority of law; . . . the means or method pointed out by a statute, or used to acquire jurisdiction of the defendants, whether by writ or notice." (Page 766.) These words, "actions," and "process," were evidently used to prevent difficulties which might otherwise arise in obtaining jurisdiction of such corporations, and to

avoid questions concerning the same such as are here presented. We think the service had was sufficient to give the court jurisdiction of the defendant in this prosecution.

The next objection presented is that the information is insufficient and the motion to quash should have been allowed. Preliminary to a discussion of this question it may be well to give the statute under which the information was drawn. It reads as follows:

"That all arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view or which tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state, or in the product, manufacture or sale of articles of domestic growth or product of domestic raw material, or for the loan or use of money, or to fix attorneys' or doctors' fees, and all arrangements, contracts, agreements, trusts or combinations between persons or corporations, designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles, or to control the cost or rate of insurance, or which tend to advance or control the rate of interest for the loan or use of money to the borrower, or any other services, are hereby declared to be against public policy, unlawful and void.

"It shall not be lawful for any corporation to issue or to own trust certificates, other than the regularly and lawfully authorized stock thereof, or for any corporation, agent, officer or employees, or the directors or stockholders of any corporation, to enter into any combination, contract or agreement with any person or persons, corporation or corporations, or with any stockholder or director thereof, the purpose and effect of which combination, contract or agreement shall be to place the management or control of such combination or combinations, or the manufactured product thereof, in the hands of any trustee or trustees, with the intent to limit or fix the price or lessen the production and sale of any article of commerce, use or consumption, or to prevent, restrict or diminish the manufacture or output of any such article.

"That all persons entering into any such arrangement, contract, agreement, trust or combination, or

who shall after the passage of this act attempt to carry out or act under any such arrangement, contract, agreement, trust or combination described in sections 1 or 2 of this act, either on his own account or as agent or attorney for another, or as an officer, agent or stockholder of any corporation, or, as a trustee, committee, or in any capacity whatever, shall be guilty of a misdemeanor, and on conviction thereof shall be subject to a fine of not less than one hundred dollars and not more than one thousand dollars, and to imprisonment not less than thirty days and not more than six months, or to both such fine and imprisonment, in the discretion of the court.

"That the purchase, sale or manufacture of any goods, wares, merchandise or other commodities in this state by any person or corporation who has entered into any such arrangements, contracts, agreements, trusts or combinations in any other state or territory, as described in sections 1 or 2 of this act, or the purchase, sale or manufacture of any such articles by any agent or attorney for such person, or as an agent, officer or stock broker of any such corporation, as a trustee, committee, or in any capacity whatever, shall constitute a violation of this act, and shall subject the offender to the aforesaid liabilities and penalties."    (Gen. Stat. 1901, §§ 2430-2432, 2435.)

Sections 7864 and 7868 of the General Statutes of 1901 read:

"A trust is a combination of capital, skill, or acts, by two or more persons, firms, corporations, or associations of persons, or either two or more of them, for either, any or all of the following purposes:

"First. To create or carry out restrictions in trade or commerce, or aids to commerce, or to carry out restictions in the full and free pursuit of any business authorized or permitted by the laws of this state.

"Second. To increase or reduce the price of merchandise, produce or commodities, or to control the cost or rates of insurance.

"Third. To prevent competition in the manufacture, making, transportation, sale or purchase of merchandise, produce or commodities, or to prevent competition in aids to commerce.

"Fourth. To fix any standard or figure, whereby its price to the public shall be, in any manner, controlled

or established, any article or commodity of merchandise, produce or commerce intended for sale, use or consumption in this state.

"Fifth. To make or enter into, or execute or carry out, any contract, obligation or agreement of any kind or description by which they shall bind or have to bind themselves not to sell, manufacture, dispose of or transport any article or commodity, or article of trade, use, merchandise, commerce or consumption below a common standard figure; or by which they shall agree in any manner to keep the price of such article, commodity or transportation at a fixed or graded figure; or by which they shall in any manner establish or settle the price of any article or commodity or transportation between them or themselves and others, to preclude a free and unrestricted competition among themselves or others in transportation, sale or manufacture of any such article or commodity; or by which they shall agree to pool, combine or unite any interest they may have in connection with the manufacture, sale or transportation of any such article or commodity, that its price may in any manner be affected.

"And any such combinations are hereby declared to be against public policy, unlawful and void.

"Every person, company or corporation within or without this state, their officers, agents, representatives or consignees, violating any of the provisions of this act within this state, . . . either directly or indirectly, or of abetting or aiding either directly or indirectly in any violation of any provisions of this section, shall be deemed guilty of a misdemeanor, and shall be fined not less than one hundred dollars nor more than one thousand dollars, and confined in jail not less than thirty days nor more than six months."

There may be other statutes the language of which would in general terms meet the allegations of the information, but the foregoing contain in substance all that the information charges. It is apparent from this statute that the main purpose of the law is to prevent combinations and organizations of all kinds created for the purpose of controlling trade, transportation, production, price or traffic in commercial commodities. To make the provisions of the statute more effective in the accomplishment of this object, the pur-

chase, sale or manufacture of commodities by a corporation which has entered into such a prohibited combination is made an offense by section 2435. The information, under these provisions, charges the defendant with forming and entering into an unlawful combination for the manufacture and sale of harvesting machinery, and of afterward making numerous sales of such commodities. The information contains seventy-five counts, and each charges a separate sale. It is impracticable to reproduce it here as a whole, but counts five and seven will show fully the general character of the pleading, and will also indicate the nature of the objection urged against it. These counts read:

"(5) That on each and all of said dates above set forth the defendant had unlawfully entered into a combination, contract, conspiracy, and agreement with certain persons, firms, and corporations, and with the directors, stockholders, servants, employees and agents thereof, as is hereinafter more particularly set forth, and had issued, caused to be issued, and assisted in issuing, certain trust certificates of stock, all for the unlawful purpose, effect and intent of placing the management of said combination and the defendant's business in the control of the trustees holding such trust certificates, and with the intent of fixing and limiting the price of certain articles of commerce, use and consumption hereinafter named, and to lessen the production and sale of articles of commerce, use, and consumption, and to prevent, restrict and limit the manufacture and sale of such articles of commerce, and to establish a monopoly therein, as hereinafter more particularly described and set forth."

"(7) And that said defendant had, at and on all the dates mentioned herein, entered into a combination and into contracts and agreements with the said persons and corporations with a view to preventing the sale and free competition in the importation, transportation and sale of articles imported into this state, and in the product, manufacture and sale of the articles of commerce described herein, for the purpose of advancing and controlling the price and cost thereof to the consumer within this state, and with the intent to limit and fix the price thereof and lessen the production and sale

The State v. Harvester Co.

of said articles of commerce, use, and consumption, and had thereby conspired and combined with said persons within and without the state of Kansas for the purpose of securing a monopoly in the trade, commerce and line of business herein described, and had on all the dates mentioned herein created and entered into a combination of capital, skill and acts between defendant and two or more of the persons, firms and corporations mentioned above for the purpose of carrying out restraints in trade and commerce and aids to commerce, and in the full and free pursuit of the business authorized and permitted by the laws of this state as herein described; and for the purpose of increasing the price of said merchandise; and for the purpose of preventing competition in the manufacture and sale of said merchandise and commodities; and for the purpose of fixing and controlling the price thereof to the consumers and purchasers of said commodities in the regular trade within the state of Kansas; and had, on said dates mentioned, entered into contracts, obligations and agreements, as herein set forth, by which they had bound themselves not to sell and manufacture, transport or dispose of said commodities below a common stated figure and price; and for the purpose of fixing and maintaining the price of such articles, commodities and articles of commerce at a fixed and graded figure; and for the further purpose of precluding a free and unrestricted competition among themselves and others in the transportation, sale and manufacture of all of such articles and commodities; and that, by the terms of said contracts and agreements, they had agreed to pool and combine and unite any and all interests they have in the manufacture, sale and transportation of all of such articles of commerce, commodities and merchandise, herein described; and that such agreements, averments, obligations and combines were and are all in violation of the common law, the statutes and the public policy of the state of Kansas, and null and void, as more fully appears from the allegations and averments following."

The other counts of the information allege substantially these facts: On August 12, 1902, the International Harvester Company was organized under the laws of the state of New Jersey, and afterward, under

the outward appearance of a purchase, it acquired the control of the Milwaukee Harvester Company, a corporation which had been organized under the laws of the state of Wisconsin, and was then engaged in the manufacture, purchase, repair and sale of all kinds of harvesting machinery and appliances, and was possessed of a large amount of assets. On September 18, 1902, the International Harvester Company, of New Jersey, caused the corporation so acquired to be reorganized under the laws of the state of Wisconsin as the International Harvester Company of America, with a capital stock of $1,000,000, and such corporation has ever since, under such corporate name, managed and operated the business thus acquired. About the same time the Milwaukee company was obtained the International Harvester Company, of New Jersey, also purchased in the same manner several other corporations of the same character, among which were the McCormick Harvesting Machine Company, the Deering Harvester Company, the Plano Manufacturing Company, the Warder, Bushnell & Glessner Company, Aultman, Miller & Co., D. M. Osborne & Co., and the Minneapolis Harvester Company, all of which were engaged in the manufacture and sale of harvesting machinery and operating in competition with each other. All of these corporations are now held and controlled under the management of the International Harvester Company, of New Jersey. None of these transfers was an actual sale made in good faith, but they were mere shifts by which to create a consolidation, under one management, of these immense aggregations of capital, and thereby control the price, manufacture and sale of such machinery. The purchase of these corporations was accomplished by issuing to them, in payment therefor, the stock of the International Harvester Company, of New Jersey, which was selected by the association to hold and manage the business for all. The defendant, under the contract

of the association, buys the entire output of machinery produced by the subordinate companies, and places the same upon the market through its agents at prices fixed by it, each agent being confined exclusively to the sale of machinery obtained from this company. The machinery now controlled by this combination, through this corporation, constitutes a vast majority of the best quality of the articles of commerce aforesaid. By the contract under which this combination was made the defendant receives all commodities sold by it from the holding company, and is prohibited from dealing in any other, while the subordinate corporations dispose of all their productions to the holding company and are prohibited from selling their products to any other buyer. On October 1, 1904, the defendant corporation made application to the charter board of this state for permission to transact business within this state, which application was granted, and the defendant has ever since that date been engaged in the transaction of business under such unlawful organization and combination, and has, through local agents, made sales of a large amount of machinery and other harvesting appliances.

The information also charges specific sales as having been made by the defendant under this combination in this state through local agents. Each sale complained of is averred in a separate count. As an indication of the pleading, the first count in which a sale is charged will be given. After proper preliminary and introductory averments, which incorporate in the count the preceding allegations of the information, the substance of which has been hereinbefore given, it is charged that the defendant "did on the 30th day of July, 1905, at the county of Shawnee and the state of Kansas, through one Pratt Brothers, one of its retail dealers and agents, so coerced and compelled by said illegal acts and combinations to enter into such exclusive contracts with the defendant, unlawfully sell and deliver certain goods,

machinery and merchandise in pursuance of an illegal combination and trust agreement, the exact or a more perfect description of said machinery and the name of the purchaser thereof affiant is unable to give; all of which acts and conduct of defendant are against the statutes of the state of Kansas in such cases made and provided, and against the peace and dignity of the said state."

The other counts charging sales are identical with this, except as to the name of the agent making the sale.

The grounds in the motion to quash are: (1) The facts stated do not constitute a public offense; (2) the information is so uncertain that the defendant can not plead thereto; (3) the offenses are not stated with certainty; (4) if any offense is charged, then there are several, and the information is bad for duplicity.

The defendant in argument supports the motion to quash with great force by propounding the inquiry, What public offense do these allegations charge? It then claims that the statute under which it supposes the information to have been drawn contains at least five distinct offenses, all of which are covered by the averments of the information which precede the part designated "count 1." Count 1, and each of the seventy-four succeeding counts, contains a charge of an unlawful sale. The argument does not seem to discriminate clearly between the offenses created by the statute and those sought to be charged in the information. There may be many other offenses for which the defendant might, under the numerous statutes of this state, have been charged. The attorney-general, however, seems to have refrained from charging anything other than unlawful sales.

In our view the information, taken as a whole, clearly indicates that the offenses intended to be prosecuted thereunder were sales of machinery made by a corporation belonging to a combination which is unlawful un-

der the statute of this state—in other words, sales made in violation of section 2435 of the General Statutes of 1901, which, in part, reads:

"That the . . . sale . . . of any . . . commodities in this state by any corporation who has entered into any such arrangements, contracts, agreements, trusts or combinations in any other state or territory, as described in sections one or two of this act . . . shall constitute a violation of this act."

The numerous sales specifically and separately alleged indicate the intent of the prosecutor. To make these sales appear unlawful it was not only proper, but necessary, to show by allegations somewhere in the information that they were made by a corporation then acting under some one of the many arrangements, contracts, agreements, trusts and combinations made unlawful by the statute. It was deemed necessary when the statute was drawn to use language broad enough to cover every conceivable combination through which the interdicted acts could by any reasonable possibility be perpetrated. It was thereby made necessary for the pleader, in drawing an information like the one under consideration, to be somewhat general in the use of terms to designate the combination to which the defendant belonged. It may also be said that the parts of the information specially complained of are not the parts which charge the offense of which the defendant is accused, but they constitute a mere statement, introductory and preliminary to the charge. Such matters of inducement need not be averred so definitely and with that degree of certainty required in the charging part of the pleading. (1 Bouv. Law Dict., p. 1024.) It seems clear from these introductory allegations that the defendant at the time the alleged sales were made had entered into one or more of the prohibited organizations. This is sufficient; whether it belonged to one of such organizations, or all of them, is immaterial. We think these averments sufficiently perform the office

25—79 KAN.

for which they were designed, and do not, for the purpose of prosecuting the defendant therefor under this information, charge it with the offense of entering into any of the organizations or combinations prohibited by the statute. We can not say that the ruling of the district court upon the motion to quash was erroneous.

It is urged that the district court erred in the admission of testimony. This objection applies to the evidence of several witnesses, and a large part, if not all, of the evidence to which the objection is made was introduced for the purpose of sustaining the averments contained in the statement made by way of inducement. It will be helpful, therefore, to bear in mind the substance of these averments. To show the existence of a combination or organization of which the defendant was a part it was alleged that the defendant, the International Harvester Company of America, is a foreign corporation, organized under the laws of the state of Wisconsin; that it and several other companies represent a major portion of the harvesting machinery business in the country, and belong to a combination organized for the purpose of monopolizing the trade in harvesting machinery; that under this combination the defendant transacted business in this state and made the sales alleged. This is not a full statement of the matters sought to be established by the evidence objected to, but when these facts are considered in connection with the foregoing statement of the substance of the information the full scope of the proof to be made will be understood. Special complaint is made of the admission of the application of D. M. Osborne & Co. for permission to transact business in this state. This is one of the corporations alleged to have been in the combination. The application objected to was made in March, 1903—the exact date not being shown. In connection with the application several annual statements showing the condition of the company were admitted. The one for the year ending December 31,

The State v. Harvester Co.

1903, showed its total resources to be $7,471,666.50, nearly one-half of which, $3,279,896.67, was merchandise. In its statement for 1904 it showed a liability to R. F. Howe, who was secretary of the defendant, for the sum of $3,715,000. In the statement for 1905 a notation was made which reads:

"In explanation would say January 1, 1905, we sold all our business and assets (excepting some accounts and bills receivable) and returned same to stockholders, and at present are out of business except collecting odds and ends."

There was also evidence to the effect that D. M. Osborne & Co. had been in the business of manufacturing harvesting machinery and selling the same through local agents in this state for many years prior to 1904. After that date its machinery was sold through agencies of the defendant. The evidence shows D. M. Osborne & Co. to be a corporation organized and doing business in the state of New York, where its manufacturing establishment is located. These facts may not be very important. We are not called upon to decide their weight or effect as evidence. We think, however, that they are not so remote and disconnected from the charges against the defendant as to be inadmissible because hearsay. They are circumstances which tend to establish the alleged relationship of the defendant with that corporation. If it be conceded that the objection to this evidence was well taken when made, and might well have been sustained, yet it is familiar law that an error committed by the admission of evidence is often cured by other testimony presented during the subsequent stages of the trial. We think this rule applies here, and we conclude that, taking the case as a whole, it does not appear that the admission of the evidence objected to was erroneous.

The evidence of P. W. Griggs was also objected to, and its admission is claimed to be material error. Griggs was an important witness for the state. It ap-

pears that he had been engaged as a dealer in agricultural implements in this state for many years, and had dealt in the kind of machinery manufactured by the various companies having harvesting implements on the market, and was familiar with their manner of transacting business. The contract under which he acted for the defendant contained a clause which reads:

"Not to engage, directly or indirectly, in any sale of any mowers, binders, reapers, corn-harvesters, or attachments for the same, other than those furnished by the party of the first part, except six Wood mowers."

The witness's knowledge was limited to such as might be acquired by one engaged as a dealer in agricultural implements, including all kinds of harvesting machinery and appliances, for twenty-five years, by making agency contracts with several companies and seeing such contracts made by other agents with the same and other companies. He never visited the establishments where the machinery was manufactured, nor the company's general offices. He stated that while he acted for the defendant it made Topeka a distributing point, and handled the McCormick, Deering, Milwaukee, Plano and Osborne machines; that he transacted his business with the defendant through its general agent for this territory, with whom he had been personally acquainted for fifteen years. The specific objection to part of the evidence given by Griggs is that he assumed to know that the various corporations alleged to have combined with the defendant manufactured the machines they handled, when his statements showed that he spoke wholly from hearsay information. Whether either of these companies actually manufactured the machinery controlled by it is probably unimportant; the essential feature of the charge is that the defendant joined with the other corporations in an attempt to control and monopolize the trade in such machinery. This is the important feature of the allegation. Where the machinery handled by

them was manufactured is a matter of minor importance.

This witness also testified to having heard Cyrus McCormick deliver an address at a meeting composed of local dealers and agents in the agricultural implement business, and repeated what was said. This is objected to as hearsay. The meeting was composed of the local agents of the defendant from the territory tributary to Kansas City, Mo., being Missouri, Kansas, Oklahoma and Colorado, and other implement dealers, who met for the purpose of consultation concerning their future relations with the defendant and generally upon matters relating to the trade in agricultural implements. The meeting desired more specific information as to the business of the defendant. This meeting was held in January, 1903, soon after the organization of the defendant and before its business had become extensively known. To obtain the information from a reliable source Mr. McCormick, the president of the defendant corporation, was invited to address the meeting upon this subject. The address spoken of by Griggs was made in response to this invitation. The substance of the address, as given by the witness, is that a combination of companies had been formed which controlled ninety-five per cent. of the capital invested in the harvesting machinery business, and they intended to combine all the companies engaged in that trade and to manage the business so as to make more money for themselves and for the dealers also, and to sell the machines at a uniform price; that the names of the various companies then members of the combination were given, but the witness was unable to remember them; that the association was known as the International Harvester Company; many contracts were made by agents with the defendant during that meeting. It is insisted that this is purely hearsay. We do not think so. It is true that it does not appear that the defendant's board of directors authorized the president to ad-

dress this meeting in the interest of the company, but it does appear that this corporation had been organized but a short time. Its general plans and purposes were not as yet well known among local implement dealers. A large meeting of dealers, representing four great wheat-growing and agricultural states, was in session, and another year of trade was at hand. These local dealers were anxious to have more authentic information concerning this new corporation before finally determining their own plans of business for the incoming year. With this object in view, the president of the defendant was invited to address the meeting. The occasion presented a splendid opportunity for the company to place its business advantages before a large number of representative men having long experience in that business and in close touch with a large territory to be supplied with machines.

The speaker was introduced to the meeting as the president of the International Harvester Company. The address appears to have been confined to the business matters of this company, and contained facts which those attending the meeting were anxious to know. The occasion and the circumstances surrounding it very strongly indicate that the president of the defendant company, when he made this address, was taking advantage of a very favorable opportunity to advance the business interests of the company which he represented as its chief officer. We are unable to say that his statements made under such circumstances are inadmissible against the company, and that the trial court erred in admitting them in evidence.

C. C. Coleman testified as to the corporate and business character of the International Harvester Company, of New Jersey, the International Harvester Company of America, the Milwaukee Harvester Company, the McCormick Harvesting Machine Company, the Deering Harvester Company, the Plano Manufacturing Company, the Warder, Bushnell & Glessner Company,

D. M. Osborne & Co., and Aultman, Miller & Co.    The witness disclaimed having any personal knowledge of the facts to which he testified, and gave general reputation as the source of his information.    It is urged that the admission of this testimony constitutes material error.    This class of testimony, when used in connection with corroborating facts and circumstances, was held to be admissible to establish a corporation in the case of *The State v. Thompson,* 23 Kan. 338, 33 Am. Rep. 165, and to show a partnership in the case of *Cross v. National Bank,* 17 Kan. 336..    In this case, however, the evidence was probably immaterial, but if so we are unable to see how it could have been prejudicial to the defendant.    It was not necessary to show that the various companies which were associated with the defendant in its unlawful enterprises were corporations, or that they were engaged in the manufacture of harvesting machinery.    Any person or corporation may, under the statute, become a party to such a combination.

At the close of the evidence for the state a motion was made for an order discharging the defendant, on the ground that the evidence was insufficient to establish any offense.    This was denied, and the ruling is assigned as error.    This motion was made, we assume, upon the theory that the evidence offered by the state was erroneously admitted, and, therefore, there was no legal evidence upon which the jury could find a verdict.    Having disagreed with the defendant as to the admissibility of the evidence, we are unable to concur in the view that it is insufficient.    We think the evidence when considered as a whole tends to establish a chain of circumstances which, in the absence of anything to the contrary, justifies the inference of guilt.

The defendant requested the court to give numerous special instructions to the jury, all of which were refused, and the defendant urges that the refusal of each was material error.    The refusal of instructions num-

bered 1, 8 and 22½ was proper, as they assumed that the information contained one offense only. Those numbered 2, 4, 5, 6 and 21 were properly refused' for the reason that they make the guilt of the defendant depend upon the establishment of a combination with the International Harvester Company, of New Jersey. In our view this fact is immaterial, as the defendant would be guilty if it made sales as charged under a combination with any other person or corporation. We do not understand that a prosecutor must prove everything alleged in the information when it is not necessary to establish an offense. Instructions numbered 3, 7 and 19 were properly refused for the reason that they placed an erroneous limitation upon the application of the evidence referred to. Those numbered 16, 17, 18 and 20 were properly refused for the reason that they are misleading, as they were liable to give the jury an erroneous view of the application of the evidence referred to. No. 23 has no application to the case.

Instructions numbered 9, 10, 11, 12, 13 and 14, requested by the defendant, are based upon the theory that where two or more counts aver a sale upon the same date, without an express allegation that they were separate transactions, it must be assumed that each count is founded upon the same act, and the various counts contain but one offense. As applied to this case, Phelps, who was one of the defendant's local agents, made six sales on September 15, 1905, and he so testified. These six separate sales are each charged in a separate count. Each count states in substance that the defendant, on September 15, 1905, through its agent, Phelps, did sell, etc. There is no allegation that such sale was another or different sale from those charged in other counts. This specific question was not raised during the trial until these instructions were requested, and was not suggested at any time before that, except in the general grounds of the motion to quash, which were that "the information is so uncertain that

the defendant can not plead thereto; the offenses are
not stated with certainty." The objection is very tech-
nical. The evidence shows separate sales. Each of the
sales charged was established by the same testimony.
If the defendant was guilty under one count it was
guilty under all. This question should have been spe-
cifically pointed out to the court when the sufficiency
of the information was being questioned. Such a de-
fect would naturally be overlooked by a court when
examining the information under a motion to quash
upon grounds as general as in this case. We are not
inclined to look with favor upon objections of this kind,
made under such circumstances. We are unable to see
how the material rights of the defendant could have
been prejudiced by the ruling of the court, and can
not, therefore, say that error was committed.

The trial court gave nineteen instructions to the
jury, to each of which the defendant excepted. Some
of these instructions are quite lengthy and it is not
practicable to reproduce them here. We have examined
all of them and noted the specific objections which are
made thereto. The criticism made of them is caused
principally by the fact that the trial court and the de-
fendant had opposite views as to the theory upon which
the case should be presented to the jury. We agree
with the view taken by the court, and think that such
view was clearly presented by the instructions. Special
objections are made to instructions numbered 7 and
10. These instructions were evidently intended to ap-
ply to the testimony of one of the witnesses who testi-
fied that he had been a dealer in agricultural imple-
ments for years before the defendant appeared in this
state, and had handled mowers made by the Plano com-
pany. In 1905 he made an agency contract with de-
fendant, and also arranged that, as to mowing-machines,
he would buy them outright and sell them as his own.
Other commodities he handled under his agency con-
tract. By these instructions the jury were told that

whether a transaction should be regarded as a sale by the defendant or a delivery to an agent would depend upon the intent of the parties, and not necessarily upon the form of the contract. We think this was correct.

We are unable to find error in the instructions given, nor have we been able to find that the trial court committed error prejudicial to the rights of the' defendant anywhere in the record presented, and therefore the judgment is affirmed.