STATE, Respondent, vs. SURMA and another, Appellants.*

*February 6—March 3, 1953.*

* Motion for rehearing denied, without costs, on May 5, 1953.

For the appellants there was a brief and oral argument by *Allan Cain* of Kaukauna.

For the respondent there was a brief by the *Attorney General* and *William A. Platz,* assistant attorney general, and oral argument by *Mr. Platz.*

FRITZ, C. J.   On June 19, 1951, a dog owned by Harley Heinz, who was a neighbor of the appellants, wandered and strayed over to a farm owned by the appellants' parents. Appellants had never seen the dog before, and did not know whose dog it was. He was a large rangy coon-hunting dog, and did not have a license attached to his collar, or to any other part of the dog. Upon the trial of the action, the appellants introduced testimony to the following effect: That the dog bothered the animals on their parents' farm, and appel-

lants caught the dog and tied him up in the barn and gave him some straw to lie on; and that on the next day, the dog was let loose so that he might go home, but instead he ran among the cattle and scared them; that the dog was caught again and tied to a grindstone and later let loose again, but he always came back to the parents' farm, and was always fed and watered while there; that on Thursday, June 21, 1951, after milking time in the evening, the appellants, Walter and Emil, decided that they would take the dog in the automobile to a crossroad, about a mile away from the farm, and leave him out at the crossroad, so that he would not return to the farm, and would in some way find his way home; that before putting the dog in the automobile, appellants tied a tin can to his tail and filled the can with stones, so that it would frighten the dog away from the farm; that after the can was tied to his tail, the dog went about 200 feet away, but always came back to the farm; that appellants then put the dog in the automobile and Walter drove the car, and Emil held the dog; that appellants were in the front seat as they proceeded down the roadway and the dog became unruly and jumped around in the car from the front to the back seat and they thought that the dog might jump through the window; that Walter then decided to tie the dog behind the automobile, and lead him the rest of the way to the crossroad, which was their destination. A rope was found in the rear of the automobile and the appellants tied the dog to the right side of the rear bumper, approximately two or three feet from the exhaust pipe, which extended two or three inches beyond the bumper; and they tied the dog to the right side of the bumper so that he could not wander into approaching traffic. After tying the dog, Walter resumed his position as the driver of the automobile, and Emil became the lookout to watch the progress of the dog as they drove along the road. Appellants testified that the maximum speed the car was driven was from 10 to 15 miles per hour. On three

separate occasions Emil looked out to see the dog, and the first and second time he reported that the dog was getting along fine; but that the third time he looked at the dog, he was down and dragging, and Emil then informed Walter, who immediately stopped the car and got out. He testified that the dog had been dragged for some distance—approximately over a 15-acre tract of land—and that he listened to the dog's heartbeat and saw that his tongue was out; and upon hearing no heartbeat, he figured that the dog had died. There was some blood on the highway, and Walter became scared and then cut the rope and placed the dog in a ditch alongside the highway. Neither Walter nor Emil considered at that time that the dog might have become asphyxiated from the exhaust of the automobile. On the trial there was ample evidence which the court could consider credible to establish that a trail of blood was traceable for six tenths of a mile in the road to the place where the dog was ultimately found.

The offense was committed by appellants on a Thursday afternoon, and the dog was not found until the following Sunday afternoon. He was found by a neighbor who knew the owner, Harley Heinz. He testified that he found the dog in the ditch with a tin can tied to his tail, and he then took the dog to a veterinarian that Sunday night, who in testifying, described the dog's condition as follows:

"The front leg as I remember, and the sternum—the rib part was completely denuded of muscle and tendons were rotted. The bones were dried up and were exposed. The back leg—I can't remember—I think it was the right rear leg toward the paw was also completely denuded—the bones were exposed. It was quite offensive and the flies have gotten in there sometime previously and it was just full of maggots. They were terrifically bad. The prognosis on the dog was very poor when it was brought in. . . . It was at night, and the next morning the dog was dead."

These terrible injuries to the dog, together with the trail of blood, constituted evidence which amply supported the finding of violation of sec. 343.47 (1), Stats., by appellants, and tended to prove some of the testimony given by appellants to be untrue.

Harley Heinz, owner of the dog, had duly licensed the same, but at the time of the commission of the offense by appellants, the license tag was not affixed to the dog's collar. In view of this, appellant's counsel contends that sec. 174.10 (1), Stats., prevented them from being prosecuted under sec. 343.47 (1), and they rely upon the statement in the decision of this court in *State v. Garbe,* 256 Wis. 86, 89, 39 N. W. (2d) 743, reading:

"The prerequisite facts required by the portion of sec. 174.10, quoted, do not affirmatively appear and no civil or criminal action may be maintained for the dog's destruction."

In the *Garbe Case,* we had a shooting and killing of a dog with no element of cruelty to animals present. In the instant case, we have an instance of extreme cruelty to a dog. In the light of this, we believe we should make a further analysis of sec. 174.10 (1), Stats., which reads as follows:

"The fact that a dog is without a license attached to a collar shall be presumptive evidence that the dog is unlicensed. No action shall be maintained for an injury to or the destruction of a dog without a tag, unless it shall appear affirmatively that the dog is duly licensed and that a tag had been properly attached to the collar of the dog and had been lost or removed without the knowledge or consent of the owner, or that the dog is not required to be licensed. . . ."

The question is whether the words "no action" contained in that statute should be held to include criminal, as well as civil actions, or whether it should be construed to refer to civil actions only.

The words "action" or "actions" appearing in a statute have been construed by many courts as to whether such terms embrace criminal as well as civil actions, or whether they are limited solely to civil actions. The following decisions have construed such terms in a particular statute to refer only to civil, and not to criminal, actions: *United States v. Safeway Stores* (10th Cir.), 140 Fed. (2d) 834, 838, 839; *Calkins v. State,* 14 Ohio St. 222, 233; *Harger v. Thomas,* 44 Pa. 128, 130, 84 Am. Dec. 422; *Commonwealth v. Gallo,* 275 Mass. 320, 335, 175 N. E. 718; *United States v. Goodhues* (D. C. Md.), 53 Fed. (2d) 696, 701; and *Wynn v. Commonwealth,* 198 Ky. 644, 249 S. W. 783. Probably an equal number of decisions could be cited contra to the effect that the use of the word "action" includes criminal actions.

Because of this division of authority, it is apparent that the use of the term "action" in sec. 174.10 (1), Stats., is an ambiguous one, and it is for this court to construe the legislative intent. No definition of the word "action" is included among the definitions appearing in ch. 370, Stats., entitled "Construction of Statutes." Secs. 260.03 and 260.05 do refer to the fact that actions may be criminal as well as civil, but ch. 260 is entitled "Civil Actions, and Parties Thereto," and we do not construe secs. 260.03 and 260.05 to have been intended by the legislature to provide that wherever the word "action" appears in a statute it must be deemed to include a criminal as well as civil action. Furthermore, even if secs. 260.03 and 260.05 were construed as providing a definition of "action," sec. 260.01 limits their scope to Title XXV, Stats., which embraces only chs. 260 to 281, inclusive, and such definitions would not apply to any other statute outside of Title XXV.

It would lead to an absurd result to hold that the legislature considers it to be a crime to cruelly maim a dog with a license tag on its collar, while it is not a crime to inflict the same

cruelty upon another dog without such a tag on its collar. There is the well-known principle of statutory construction that unreasonableness or absurdity is to be avoided. This is well stated in 50 Am. Jur., Statutes, p. 385, sec. 377, as follows:

"A statute subject to interpretation is presumed not to have been intended to produce absurd consequences, but to have the most reasonable operation that its language permits, and it is a general rule that where a statute is ambiguous in terms and fairly susceptible of two constructions, the unreasonableness or absurdity which may follow one construction or the other may properly be considered. In some cases involving the construction of a statute, considerations of what is reasonable are even regarded as having potent influence. If possible, doubtful provisions should be given a reasonable, rational, sensible, and intelligent construction. Unreasonable, absurd, or ridiculous consequences should be avoided."

Sec. 343.47, Stats., also applies to all domestic animals, such as horses, cattle, sheep, pigs, etc., as well as dogs. The evident purpose of sec. 174.10 (1) was to penalize the dog owner who fails to purchase a license, and not to relieve from criminal liability the person who cruelly maims or tortures a dog. The cruelty which sec. 343.47 was intended to punish is just as abhorrent, from the standpoint of public morals, in the case of an unlicensed dog as in the case of one whose license is affixed to its collar.

If we were considering the meaning of sec. 174.10 (1), Stats., for the first time in this case, we would construe such statute as only referring to civil actions, and not to criminal actions, in order to avoid absurd and unreasonable consequences. This leaves as the remaining question whether our decision in *State v. Garbe, supra,* must be adhered to under the rule of *stare decisis.*

Such decision did not involve a "rule of property" nor establish a rule to be followed in commercial transactions.

Courts should be most reluctant to overrule a prior decision that lays down a "rule of property" or a rule that governs commercial transactions. Furthermore, courts are more prone not to apply the doctrine of *stare decisis* to a single decision as distinguished from a line of decisions adhering to the same principle. 14 Am. Jur., Courts, p. 295, sec. 82. The rule that legislative intent may be based upon inaction of the legislature following a court decision, construing a statute does not apply here because *State v. Garbe, supra,* was decided in 1949, and there has been but one complete session of the legislature since then—that of 1951. The failure of a single session of the legislature to act to amend a law following a single court decision is not accorded much weight in ascertaining legislative intent. 50 Am. Jur., Statutes, p. 318, sec. 326, states the applicable principle as follows:

"It is a general rule that the intent of the legislature is indicated by its action, and not by its failure to act. On the other hand, it has been declared that the silence of the legislature, when it has authority to speak, may sometimes give rise to an implication as to the legislative purpose, the nature and extent of that implication depending on the nature of the legislative power and the effect of its exercise. The fact that the legislature has not seen fit by amendment to express disapproval of a contemporaneous or judicial interpretation of a particular statute, has been referred to as bolstering such construction of the statute, or as persuasive evidence of the adoption of the judicial construction. In this respect, it has been declared that where a judicial construction has been placed upon the language of a statute *for a long period of time,* so that there has been abundant opportunity for the lawmaking power to give further expression to its will, the failure to do so amounts to legislative approval and ratification of the construction placed upon the statute by the court, . . ." (Emphasis supplied.)

It is, therefore, our conclusion that this court should not invoke the doctrine of *stare decisis,* and *State v. Garbe, supra,*

is overruled in so far as it construes sec. 174.10 (1), Stats., as being applicable to criminal as well as civil actions.

*By the Court.*—Judgment affirmed.

GEHL, J. (*dissenting*). The question whether under the provisions of sec. 174.10 (1), Stats., a criminal action may be maintained for the destruction of a dog without a tag was squarely before this court in *State v. Garbe,* 256 Wis. 86, 39 N. W. (2d) 743. We held that it may not and thus declared the meaning of the word "action" in the. statute. Facts are presented in the instant case which portray a picture of extreme cruelty, a picture much more repulsive and shocking than that exhibited in the *Garbe Case, supra.* But we did not give to the statute the construction which we did because it appeared that the act of the defendant was one of a lesser degree of cruelty. We said in clear terms and language that the statute means what it says, that (p. 89) " '*No* action shall be maintained for an injury to or the destruction of a dog without a tag, . . .' " Manifestly, we found no ambiguity in the language. I find no need for judicial construction now.

If it be conceded that there is ambiguity in the statute, which I do not, still we need not labor through the opinions of courts of other jurisdictions in search of a definition of the word "action" as it is used in the statute. Indeed, we may not when it appears, as it does here, that the legislature has provided its own definitions. *McCarthy v. State,* 170 Wis. 516, 175 N. W. 785. One is found in sec. 260.03, Stats. :

"An action is an ordinary court proceeding by which a party prosecutes another party for the enforcement or protection of a right, the redress or prevention of a wrong, *or the punishment of a public offense.* Every other remedy is a special proceeding."

This is a clear and unambiguous definition of what the majority considers is an ambiguous term.

Sec. 260.05, Stats., provides:

"Actions are of two kinds, civil and criminal. A criminal action is prosecuted by the state against a person charged with a public offense, for the punishment thereof. Every other is a civil action."

Remedies in the courts are divided into (1) Actions, (2) Special proceedings, sec. 260.02, Stats. Actions are not divided into three classes—civil, criminal, and special proceedings. These provisions of the statutes remove from sec. 174.10 (1) any doubt which might be said to exist as to the meaning of the word "action" in sec. 174.10 (1).

Certainly the construction given to the word "action" by the court in the *Garbe Case, supra,* and which I agree is the only one permissible, would, as is evidenced in this case, produce an undesirable result. But the court may not encroach upon the field of the legislature whose exclusive function it is to amend the statute and thereby to supply what the majority says should be read into it.

"The rule that the clear letter of a statute will be departed from where absurd results would otherwise follow must be carefully applied. The danger is that of substituting the judgment of the court for that of the legislature as to what is sound or absurd. The rule is only one of construction; the fact that absurd or unjust results follow the literal application of the language simply justifies a search of the statute for further but perhaps less obvious indications of legislative intent. It does not, however, justify a court in amending the statute or giving it a meaning to which its language is not susceptible merely to avoid what the court believes are inequitable or unwise results." *State ex rel. Associated Indemnity Corp. v. Mortensen,* 224 Wis. 398, 401, 272 N. W. 457.

"Courts are not responsible for the law. It is their province to declare and apply it and to construe statutes and constitutions in accordance with the will of the lawmaking

power, where construction becomes necessary. When such construction has once been given to a law and finally established as a part thereof, it is as much a part of it as if embodied therein in plain and unmistakable language. *State ex rel. Heiden v. Ryan,* 99 Wis. 123. When that situation exists it is the province of the legislature alone to change the law. The court should not attempt it, whatever may be the notions of judges as to what the law ought to be." *Eau Claire Nat. Bank v. Benson,* 106 Wis. 624, 627, 82 N. W. 604; *Will of Kootz,* 228 Wis. 306, 309, 280 N. W. 672.

Since announcement of the decision in the *Garbe Case, supra,* there has been a session of the legislature and an opportunity for it to supply what the majority apparently considers an omission. For some reason best known to its members and with which we are not to be concerned, it has not amended the statute by limiting its application to civil actions.

"The legislature by not amending the statute has accepted the statute with the court's construction incorporated therein. *Manley v. Mayer,* 68 Kan. 377, 379, 380, 75 Pac. 550. Assuming that the court has power to modify or limit its former construction, and thus, in effect, amend the statute, we consider that if a change in the statute should be made the change should be made by the legislature by amendment of the statute rather than by the court's overruling the construction heretofore given." *Milwaukee County v. City of Milwaukee,* 210 Wis. 336, 342, 246 N. W. 447; *State ex rel. State Central Committee v. Board,* 240 Wis. 204, 3 N. W. (2d) 123; *Briggs & Stratton Corp. v. Department of Taxation,* 248 Wis. 160, 21 N. W. (2d) 441.

The majority say that ambiguity appears in the statute by reason of the fact that there is a division of authority as to the meaning of the word. A number of cases are cited by the majority as having construed the term as referring only to civil actions. In not one of them does it appear that the court had available or was limited by a statutory definition such as we have in the instant case.

On the other hand, there have been cases in which the court was required to construe the term in the light of legislative definition and in which the argument for a restricted definition was rejected. Such is *State v. International Harvester Co.* 79 Kan. 371, 99 Pac. 603, where the word "action" was defined in statutory terms almost identical with ours. So in *People v. Elliott,* 172 N. Y. 146, 64 N. E. 837, where the court held that the language of a statute identical with that contained in our sec. 260.03, Stats., renders it clear that the word includes both civil and criminal actions.

Thus we find that there is no division of authority on the precise question which we have before us. The majority have cited no case in which it has been determined by a court, supplied with a statutory definition as we are, that there is ambiguity in the word.

The majority would ignore the statutory definitions set forth above because they do not appear in ch. 370, Stats., entitled "Construction of Statutes." Would they say that the chapter is all-inclusive? If so, what are we to do with the hundreds of definitions contained in dozens of the chapters of the statutes? Are they to be ignored because they do not appear in ch. 370?

They would also reject the statutory definitions because they appear in ch. 260, Stats., entitled "Civil Actions, and Parties Thereto." I would concede that in a proper case, where the meaning of a statute is left in doubt, resort might be had to its title in aid of construction. I would not concede, however, that the title is conclusive as to the meaning of a statute which is free from doubt or ambiguity, or that it should be resorted to for aid in an effort to distort the meaning of an unambiguous statute. 50 Am. Jur., Statutes, p. 300, sec. 312. Matters extrinsic may be resorted to for aid in the construction of a statute of doubtful meaning, but they may not be invoked to create an ambiguity.

As long ago as in 1937 the attorney general concluded that under sec. 174.10 (1), Stats., no criminal action is maintainable against one killing an unlicensed dog and so stated in an opinion found in 26 Op. Atty. Gen. 434. That opinion would not, of course, justify the defendants in their act nor shield them from its legal consequences. Nor is it conclusive or binding. But we may not ignore it entirely. The legislature has met at least seven times since and has not seen fit to amend the statute. That is some evidence that it has been satisfied with the attorney general's construction.

It is significant also that in 1949, twelve years after publication of the opinion of the attorney general, the attention of the legislature was brought to sec. 174.10, Stats., for in that year, by ch. 577, Laws of 1949, it amended its provisions. It would seem that if at that time the legislature were not satisfied with the construction of the attorney general it would have enacted additional amendments and thereby have rejected his interpretation. Or should we assume that the legislature is not concerned with the conclusions of an officer of government who is required by law to issue opinions for the assistance of the various departments? I think not. Much less do I think that we should ignore the construction placed by this court upon an unambiguous statute and encroach upon the field of the legislature by amending one of its enactments because we are not pleased with its consequences. We should be content to confine our activities to the field which has been assigned to us.

Had the legislature intended the word "action" in sec. 174.10 (1), Stats., to exclude criminal actions it would have been a simple matter to have done so by restricting its meaning by the use of the term "civil actions" or "actions for damages."

I am authorized to say that Mr. Justice BROADFOOT and Mr. Justice BROWN concur in this dissent.