SAMPSON INVESTMENTS, a Wisconsin partnership, by Bernard J. Sampson and Harold Sampson, its general partners, Plaintiffs-Appellants,

v.

JONDEX CORPORATION, a Wisconsin corporation, and Mega Marts, Inc., a Wisconsin corporation, Defendants-Respondents-Petitioners.

Supreme Court

*Nos. 91–0297, 91–0957. Oral argument January 6, 1993.—Decided May 13, 1993.*

(Also reported in 499 N.W.2d 177.)

For the defendants-respondents-petitioners, Jondex Corporation there were briefs by *Kenneth R. Nowakowski, Bruce G. Arnold, Barbara J. Janaszek* and *Whyte & Hirschboeck, S.C.,* Milwaukee and oral argument by *Mr. Arnold.*

For the defendants-respondents-petitioners, Mega Marts, Inc., there were briefs by *James O. Huber, David Lucey* and *Foley & Lardner,* Milwaukee and oral argument by *Mr. Lucey.*

For the plaintiff-appellants there was a brief by *John a. Busch, David B. Kennedy* and *Michael, Best & Friedrich,* Milwaukee and oral argument by *Mr. Busch.*

Amicus Curiae brief was filed by *Thomas G. Cannon* and *O'Neil, Cannon & Hollman, S.C.,* Milwaukee, for Wisconsin Grocers Association and Wisconsin Merchants Federation.

DAY, J.   This is a review, granted to defendants Jondex Corporation ("Jondex") and Mega Marts, Incorporated ("Mega Marts"), of an unpublished court of appeals decision which affirmed in part and reversed in part a summary judgment in favor of the defendants by the circuit court for Milwaukee County, Honorable Francis T. Wasielewski, Judge.

This case presents two issues for review, both of which involve a commercial lease agreement between Jondex, the lessee, and Sampson Investments ("Samp-

58

son"), the lessor, which states that "[t]he premises shall be occupied and used only for the following purpose or purposes: A 'retail warehouse store' selling articles found in family centers and supermarkets." The first issue is whether the lease requires Jondex to continuously operate a retail warehouse store. We hold that the lease does not require continuous operation. The second issue is whether Sampson can maintain a claim for tortious interference with contract against a third party, Mega Marts, even though Jondex did not breach the lease agreement. We conclude that Sampson cannot maintain such an action.

The relevant facts are not in dispute. Sampson, a commercial real estate manager and developer, owns Westlane Shopping Center in West Allis, Wisconsin. Jondex operates warehouse-style supermarkets. Mega Marts also operates warehouse-style supermarkets and leases properties to be used as warehouse-style supermarkets.

Jondex and Sampson entered into a commercial lease agreement on October 15, 1975. Paragraph three of the lease, which is the center of the controversy, provides in part as follows:

> The premises shall be occupied and used only for the following purpose or purposes: A 'retail warehouse store' selling articles found in family centers and supermarkets. Tenant shall have the exclusive right to operate a supermarket in the Shopping Center. . . . Landlord covenants and agrees that it will not use nor permit any person or entity to use any portion of the Shopping Center for heavy manufacturing or the exclusive sale of health and beauty aids or for any use of tenancy that creates unreasonable levels of (i) noise, (ii) noxious odors, or (iii) overburdening of parking areas in the shopping

59

Center during the lease term hereof so long as Tenant is in occupancy hereunder.

The lease also requires Jondex to pay a flat-rate monthly rent and gives Jondex the right to sublet the property without Sampson's consent.

In accordance with this lease, Jondex operated a "Pick 'N Save" store and served as the "anchor tenant"[1] in Westlane Shopping Center. In June, 1990, however, Jondex informed Sampson that they planned to cease operating a grocery store in Westlane Shopping Center but would continue to pay the full rent. Additionally, Jondex entered into a commercial lease agreement with Mega Marts to operate a "Pick 'N Save" store approximately two blocks away from Westlane Shopping Center.

Sampson subsequently sued Jondex and Mega Marts, claiming that: (1) Jondex's stated intention to cease operating a store in the Westlane Shopping Center constitutes a breach and repudiation of the lease agreement; (2) Mega Marts tortiously interfered with the lease agreement to the financial detriment of Sampson; and (3) Jondex and Mega Marts conspired to injure Sampson's business in violation of sec. 134.01, Stats. 1989–90.[2] The circuit court granted the defend-

---

[1] Sampson asserts that "[t]he Westlane Pick 'N Save Food Store functions as the anchor tenant at Westlane as a result of the high shopper traffic generated by the store." Sampson further asserts that "[t]he other merchants leasing space at Westlane rely on the customer traffic generated by the anchor tenant, Jondex, for the customers necessary for their economic survival."

[2] **134.01 Injury to business; restraint of will.** Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully or maliciously injuring another in his reputation, trade, business

ants' motions for summary judgment, dismissed all three claims and also issued a declaratory judgment that Jondex could cease operating a warehouse-style supermarket without breaching the lease. Jondex then closed the "Pick 'N Save" located in Westlane Shopping Center.

Sampson appealed and the court of appeals upheld the dismissal of the conspiracy claim. The court of appeals, however, concluded that paragraph three of the lease required Jondex to continuously operate a retail warehouse store for the term of the lease. Thus, the court of appeals ruled that Jondex breached the lease when it ceased operating the "Pick 'N Save" store. Based on the ruling that Jondex breached the lease agreement, the court of appeals also ruled that Sampson could maintain a claim for tortious interference with contract against Mega Marts.

The defendants petitioned for review of the portion of the court of appeals' decision which upheld Sampson's claims for breach of the lease agreement and tortious interference with contract. This court accepted the petition for review. The portion of the court of appeals' decision which upheld the dismissal of the conspiracy claim was not challenged in the petitions for review and is not before this court.

## I.

The first issue is whether the court of appeals erred when it concluded that paragraph three of the

or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500.

lease requires Jondex to continuously operate a retail warehouse store. The defendants argue that paragraph three of the lease is a restrictive use clause rather than a continuous occupancy clause. While the defendants concede that Jondex must operate a retail warehouse store if they choose to use the premises, they take the position that Jondex can vacate the premises and leave the store empty as long as they continue to pay rent. Thus, the defendants assert that Jondex, provided they continue to pay rent, possesses two options under the lease: (1) refrain from using the premises; or (2) use the premises as a retail warehouse store. We agree with the defendants and therefore reverse the court of appeals.

When interpreting a contract, "[i]t must be borne in mind that the office of judicial construction is not to make contracts or to reform them, but to determine what the parties contracted to do; not necessarily what they intended to agree to, but what, in a legal sense, they did agree to, as evidenced by the language they saw fit to use." *The Wisconsin Marine & Fire Ins. Co. Bank v. Wilken,* 95 Wis. 111, 115, 69 N.W. 354 (1897). Furthermore, when interpreting a lease agreement, courts should consider that "[a]lienations of land are, or ought to be, grave and deliberate transactions. Every conveyance should contain 'the certainty of the thing granted' to the full extent of the grant. What may be expressed enlarging or restricting the grant in particular cases, should not be left to implication . . . ." *Frank C. Schilling Co. v. Detry,* 203 Wis. 109, 116, 233 N.W. 635 (1930).

When interpreting commercial lease agreements, this court has, for well over one hundred years, distin-

guished between continuous use clauses and restrictive use clauses. *See Brugman v. Noyes,* 6 Wis. 1 (1857); *Henry Rahr's Sons Co. v. Buckley,* 159 Wis. 589, 150 N.W. 994 (1915); *Dougan v. H.J. Grell Co.,* 174 Wis. 17, 182 N.W. 350 (1921). In *Brugman,* this court held that a lease which stated that the premises were "to be used as cabinet warerooms" did not require the lessee to continuously use the premises as cabinet warerooms. *Brugman,* 6 Wis. at 14. In *Henry Rahr's Sons Co.,* this court held that a lease provision which stated that "the premises were to be used for the purpose of hotel and saloon and bathing grounds" was merely a limitation of uses and not a covenant of continuous operation. *Henry Rahr's Sons Co.,* 159 Wis. at 594. In *Dougan,* this court held that a lease provision which stated that "said premises to be used only for the purpose of manufacturing butter and cheese" was a restrictive use provision and did not require the lessees to continuously use the premises to manufacture butter and cheese. *Dougan,* 174 Wis. at 23. This court explained that:

> [i]t is plain, however, that such language cannot be properly construed to imply an undertaking or obligation on the part of said lessees or their successors in interest that there should be continuously kept up for a period of ninety-nine years such butter and cheese industry. It can amount to no more at the most than to prevent the lessees from using the premises for some other than that purpose, but does not impose upon them the much greater liability and obligation of continuously carrying on the specified industry. *Id.*

Sampson argues that the cases cited above are not binding precedent because the language of the lease

provision at issue in the present case can be distinguished from the language at issue in *Brugman, Henry Rahr's Sons Co.* and *Dougan.* Although the language at issue in the present case is not identical to the language used in *Brugman, Henry Rahr's Sons Co.* or *Dougan,* these cases apply to the present case because they established the rule that commercial lessees do not have to continuously operate a business in the absence of a lease provision which expressly requires continuous operation. *See Rapids Associates v. Shopko Store, Inc.,* 96 Wis. 2d 516, 518, 292 N.W.2d 668 (Ct. App. 1980).

Sampson argues that this rule of law no longer applies because "much has changed in the world of commercial leasing" since this court established this principle. This court, however, stated that "[c]ourts should be most reluctant to overrule a prior decision that lays down a 'rule of property' or a rule that governs commercial transactions." *State v. Surma,* 263 Wis. 388, 395, 57 N.W.2d 370 (1953). We are especially reluctant to change the rule pertaining to continuous operation clauses, which are rarely found in long term commercial leases because such clauses require the lessee to continue operating a business for a long period of time even if that business is incurring substantial losses.[3] The burden that these clauses place on the

---

[3] *See* E. Halper, Shopping Center and Store Leases 9–84 (1992). "[T]enants who lease large units in community and neighborhood sized shopping centers tend to find continuous operation clauses repugnant. Merchants who resist continuous operation clauses have good reason to do so . . . . Some shopping centers look good on the drawing boards but are failures after being constructed. A tenant could find himself losing so much money in a store that he would prefer to leave the space vacant

lessee is so great as to require a clear statement of intent before imposing continuous operation. Upon consideration of the changes cited by Sampson,[4] we find none sufficient to abandon this rationale. Thus, the importance of predictability in the law of conveyancing, coupled with our finding that the changes in the world of commercial leasing have not eroded the principle enunciated in *Brugman, Henry Rahr's Sons* and *Dougan,* lead us to reject Sampson's argument. We therefore adhere to the rule that a commercial lessee is not required to continue operating a business in the absence of a lease provision which expressly requires continuous operation.

This rule comports with the statutory prohibition against implying covenants in leases for a term over one year. Section 706.10(6), Stats. 1989–90 states that ". . . no warranty or covenant shall be implied in any conveyance . . . ." Section 706.10(6) applies to the present case because a lease for a term over one year is a "conveyance" under the statute. *See* Sec. 706.01(2)(c) and (3), Stats.

In conformity with sec. 706.10(6) and this court's pronouncements in *Brugman, Henry Rahr's Sons,* and *Dougan,* we examine the lease at issue in the present case for an express provision which clearly requires that Jondex continuously operate a retail warehouse store. We agree with the court of appeals and all of the parties that this lease is not ambiguous. Sampson

---

despite the obligation to pay rent . . . . Some merchants will refuse to take such a risk, even if it means breaking a deal." *Id.*

[4] Sampson lists "the intense urban development, proliferation of multi-tenant, interdependent strip shopping centers, use of key anchor tenants, and high-stakes competition for anchor tenants" as changes which have taken place in the world of commercial leasing.

argues that no implication is necessary and we need not resort to any type of extrinsic evidence because paragraph three of the lease imposes upon Jondex an obligation to continuously operate a retail warehouse store for the duration of the lease. The court of appeals accepted this argument and concluded that "the plain reading of Paragraph 3, ascribing to its words their ordinary meanings, provides for a continuous use of the premises for the term of the lease."

We disagree with Sampson and the court of appeals because we find no express provision which clearly requires that Jondex continuously operate a retail warehouse store. First and foremost, we note the absence of any specific language compelling continuous operation. In his treatise titled "Shopping Center and Store Leases," E. Halper advises practitioners as follows:

> So what do you do in the lease if you want the court to understand that the tenant is really supposed to conduct business in the store whether he wants to or not. The magic formula to accomplish this purpose is to state that the tenant is required to conduct its business **continuously**. E. Halper, Shopping Center and Store Leases 9–80 (1992) (emphasis added).

Paragraph three of the lease at issue in the present case, however, does not state that the premises shall be **continuously** occupied and used.

Furthermore, paragraph three also contains a list of restrictions on Sampson's activities which apply "so long as Tenant is in occupancy hereunder." This provision could have, but does not state that the restrictions apply for the entire term of the lease. Thus, this lan-

guage recognizes that the tenant is not required to occupy the premises for the full term of the lease.

Sampson points out that the first sentence of paragraph three contains the mandatory word "shall." Furthermore, Sampson reiterates the court of appeals' position that the word "only" modifies the word "used" but not the word "occupied." Thus, Sampson and the court of appeals read the first sentence of paragraph three as requiring that: (1) the premises shall be occupied; and (2) the premises shall be used only for a retail warehouse store. Sampson argues that any other reading of the first sentence would render the word "occupied" superfluous.

Jondex counters by claiming that the term "occupy and use" is a term of art and the word "only" modifies the entire term. Furthermore, Jondex claims that an interpretation of paragraph three as a covenant of continuous operation would render the word "only" superfluous. Although the inclusion of the word "shall" and the inclusion of the word "occupy" strengthen Sampson's argument, this language does not comprise the clear, express statement of intent necessary to mandate continuous operation.

Consideration of the lease's subletting clause supports the defendant's position. Although the court of appeals stated that their conclusion was buttressed by the fact that the subletting provision required Sampson's written consent before Jondex could sublet the premises, Sampson concedes that the court of appeals misread the subletting provision and that the lease gives Jondex the right to sublet the premises without Sampson's consent. We find this right to sublet inconsistent with a continuous operation clause because the operation could be disrupted while the sublessee takes possession and prepares the premises.

Finally, we note the absence of key provisions which would ordinarily be included in a lease which contains a covenant of continuous operation. For example, the lease does not contain any provisions that set forth the required days and hours of operation, the required level of staffing, or the required stock of merchandise.[5] Additionally, the lease does not contain a provision that sets forth the conditions[6] under which Jondex might justifiably cease operations. The absence of these provisions is significant because parties who bargain for a continuous operation clause normally include such provisions and, in the present case, a court would have to supply these provisions in the event of a dispute.

[5] A lease containing a covenant of continuous operation "should go on to state that business is to be conducted during specific hours or during hours prescribed by the merchants association or the landlord. Landlords like to supplement these statements with a requirement that the tenant 'use its best efforts to . . . maintain the highest volume of business.' . . . Another lease clause that is often combined with a requirement that the tenant continuously conduct business in the demised premises is a clause to the effect that the tenant is required to maintain a substantial stock of merchandise and adequate equipment in the demised premises." E. Halper, Shopping Center and Store Leases 9–80, 9–81 (1992).

[6] Before agreeing to a covenant of continuous operation, many tenants demand that they be allowed to cease operations under the following circumstances: (1) the premises is damaged by fire or casualty; (2) the landlord fails to provide an essential service such as heat or electricity; (3) during a strike, lockout or labor disturbance; (4) during a riot; (5) if prevented from opening the store by causes beyond the tenant's control. *See* E. Halper, Shopping Center and Store Leases 9–85 (1992).

■
Since neither the language of paragraph three, standing alone, nor the lease read as a whole, indicates a clear, express intention to mandate continuous operation of a retail warehouse store, we hold that the court of appeals erred when it read paragraph three as a covenant of continuous operation.

The court of appeals and Sampson maintain that the court of appeals' decision in *Century Shopping Center Fund I v. Crivello,* 156 Wis. 2d 227, 456 N.W.2d 858 (Ct. App. 1990) requires a different result. Although the court of appeals, in *Century,* required a commercial lessee to continuously operate a retail food market, the lease at issue in *Century* is distinguishable from the lease at issue in the present case. The lease in *Century* provided that the premises "shall be used as a retail food market and allied operation." The provision at issue in *Century,* however, differs from the provision at issue in the present case which contains the word "only." Furthermore, while the commercial lessee in *Century* was not permitted to sublet the premises without the lessor's written consent, Jondex possesses an unfettered right to sublet which is inconsistent with a continuous operation clause. Additionally, the lease in *Century* contained a percentage-of-gross-receipts as part of the rent component while the lease at issue in the present case provided for a flat-rate monthly rent.[7]

---

[7] In the jurisdictions which imply covenants of continuous operation, "[c]ourts are generally consistent in implying a covenant of continuous operation when the rent percentage provision is 'pure' or the fixed minimum rental is nominal. Likewise, courts are generally consistent in declining to imply a covenant of continuous operation when the fixed minimum rental is substantial." Comment, *Percentage Leases: Is There a*

These distinctions render the *Century* case inapposite to the present case.

Although *Century* is distinguishable from the present case, we also conclude that *Century* does not accurately state the law. This court's decisions in *Brugman, Henry Rahr's Sons,* and *Dougan* established the rule that a commercial lessee cannot be forced to continuously operate a business in the absence of a clear, express provision in the lease requiring continuous operation. The court of appeals' decision in *Century,* however, did not mention or apply the rule established in *Brugman, Henry Rahr's Sons,* and *Dougan.* Since the court of appeals did not follow the precedent set by this court, the decision in *Century* does not accurately state the law, and to the extent it contradicts the law as expressed herein, it is overruled.

Sampson also cites several cases from other jurisdictions. The cases cited, however, imply a covenant of continuous operation. *See Tooley's Truck Stop, Inc. v. Chrisanthopouls,* 55 N.J. 231, 260 A.2d 845, 849 (1970) ("[w]e readily accept the plaintiff's alternate contention that an obligation to operate the diner . . . may properly be implied."); *Ingannamorte v. Kings Supermarkets, Inc.,* 55 N.J. 233, 260 A.2d 841, 844 (1970) ("[t]he lease between the plaintiffs and [the defendant] contained enough on its face to imply an operating mandate . . . ."); *Columbia East Associates v. Bi-Lo, Inc.,* 299 S.C. 515, 386 S.E.2d 259, 262 (Ct. App. 1989) ("[i]n the absence of an express provision in the contract, the law will imply an agreement . . . ."). In light of Wisconsin's statutory prohibition against implying covenants and this court's precedent requiring an express provision which clearly mandates continuous operation, we con-

*Need To Imply a Covenant of Continuous Operation?,* 72 Marq. L. Rev. 559, 565 (1988–89).

70

clude that the cases cited by Sampson are not persuasive.

## II.

Having held that Jondex did not breach the commercial lease agreement, the next question is may Sampson maintain a claim against Mega Marts for tortious interference with contract.[8] Sampson argues that their "claim against Mega Marts for tortious interference with contractual relations and prospective contractual relations is available as a matter of law irrespective of whether there has been an actual breach of the lease agreement." We disagree.

Section 766 of the *Restatement,* provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract. *Restatement (Second) of Torts* § 766 (1979).

We have concluded that the commercial lease agreement between Jondex and Sampson provided Jondex with two alternative means of performance: (1) refrain from using the premises; or (2) use the premises only as a retail warehouse store. Thus, even if Mega Marts induced Jondex to vacate the premises, this conduct does not constitute interference with performance because Mega Marts simply induced Jondex to perform

---

[8] The court of appeals did not reach this issue because it held that Jondex breached the contract.

71

the contract in one of the two ways allowed under the contract.

Sampson correctly notes that this court, in *Wisconsin Power & Light Co. v. Gerke,* 20 Wis. 2d 181, 121 N.W.2d 912 (1963), recognized a cause of action for tortious interference with contract even though there was no breach of the contract. In *Gerke,* this court, quoting 1 Harper & James, *Law of Torts,* sec. 6.9, at 499 with approval, stated that "the value of a bargain may be impaired although there is no failure of performance." *Id.* at 187. Sampson claims that, in the present case, "the value of this bargain to Sampson Investments was to have a fully-leased, operating shopping center where all tenants would benefit and profit by continued high shopper traffic." While Sampson may have hoped for such a value, they had no reasonable expectation of such a value considering that the lease agreement, which sets forth the rights and obligations of the parties, gave Jondex the option to refrain from using the premises. Since the lease agreement, which the parties bargained for, allowed Jondex to refrain from using the premises as long as they continued to pay rent, the value of Sampson's bargain was not impaired.

To hold otherwise would allow Sampson to circumvent the limitations of the lease agreement and expand their rights through a tort claim. *Prosser & Keeton on Torts* explains that "tort liability may be imposed upon a defendant who intentionally and improperly **interferes with the plaintiff's rights under contract** with another person if the interference **causes the plaintiff to lose a right under the contract or makes the contract rights more costly or less val-**

uable." W. Page Keeton, Dan B. Dobbs, Robert E. Keeton, David G. Owen, *Prosser and Keeton On Torts,* sec. 129 (5th ed. 1984) (emphasis added). Even where there has been no breach of a contract, a plaintiff seeking to maintain a claim for tortious interference with contract must show some specific right which has been interfered with. In the present case, however, Sampson had no right to require Jondex to continuously operate a retail warehouse food store. Thus, even though Jondex refrained from using the premises, this action did not interfere with any of Sampson's rights. In fact, allowing Sampson's claim would grant them rights which the parties **did not** bargain for. The inability to show any right which was interfered with is fatal to Sampson's tortious interference claim.

*By The Court.*—The decision of the court of appeals is reversed and the cause remanded to the circuit court for further proceedings consistent with this opinion.

SHIRLEY S. ABRAHAMSON, J. *(concurring in part and dissenting in part).* The majority apparently concludes that an action for tortious interference with the performance of a contract is available only when there has been interference with a specific right bargained for under the contract. I believe that this conclusion is an overly narrow interpretation of the legal standard.

The leading Wisconsin case on tortious interference with contract, *Wisconsin Power & Light Co. v. Gerke,* 20 Wis. 2d 181, 187 (1962), does not tie the tort of intentional interference to the violation of any specific right. *Gerke* affirmed the existence of an action for tortious interference by a party who sought redress "because the performance of his contract was made less profitable." 20 Wis. 2d at 187. The *Gerke* court relied on

Harper & James, *Law of Torts,* sec. 6.9, which states that "any conduct which is intended to, and which in fact, makes performance more onerous is, unless privileged, a tort against the promisor." The *Restatement of Torts,* sec. 766A, likewise states that the action in tort is available against "[o]ne who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome . . . ."

The majority apparently derives its test from *Prosser and Keeton on Torts,* sec. 129 (1984). The quoted language from *Prosser,* however, does not support the majority's application. *Prosser* states that "tort liability may be imposed upon a defendant who intentionally and improperly interferes with the plaintiff's rights under a contract with another person if the interference causes the plaintiff to lose a right under the contract *or* makes the contract rights more costly or less valuable." Section 129, p. 978 (emphasis added).

I am not saying that an action exists in tort every time a third party makes the performance of a contract more costly. The social interest in protection of the contractual relationship is balanced against the interest in free competition. As the court of appeals for the seventh circuit stated: "In cases where no breach of contract results from the interference, the tort is really a branch of the law of unfair competition, and it is necessary for liability that the alleged tortfeasor have gone beyond the accepted norms of fair competition." *Frandsen v. Jensen-Sundquist Agency, Inc.,* 802 F.2d 941 (7th Cir. 1986) (applying Wisconsin law). *See also* Harper, James & Gray, *The Law of Torts,* § 6.13 (2d ed. 1986). To be actionable, interference with contract

must be intentional, unjustified and improper. Restatement (Second) of Torts, sec. 766; Harper, James & Gray, *The Law of Torts,* sec. 6.6; *Prosser and Keeton,* sec. 129.

Because I believe that the majority applies an incorrect legal standard, I dissent from that part of the opinion discussing the action for tortious interference.

I am authorized to state that Justice DONALD W. STEINMETZ joins this opinion.