John M. SHANK, Jr. and Access
International Markets, Ltd.,
Plaintiffs,

v.

WILLIAM R. HAGUE, INC., Defendant.

No. 97–C–1002.

United States District Court,
E.D. Wisconsin.

Aug. 13, 1998.

Bruce C. O'Neill, Diane Slomowitz, Fox, O'Neill & Shannon, Milwaukee, WI, for Plaintiffs.

John A. Busch, Michael, Best & Friedrich, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

MYRON L. GORDON, District Judge.

The plaintiffs filed this diversity action, in which they sue the defendant for tortious interference with the plaintiffs' actual and prospective contracts and business relationships, on September 23, 1997, and it is currently scheduled for a jury trial on August 17, 1998. Presently before the court is the defendant's motion for summary judgment.

### I. Undisputed Factual Background

John R. Shank, one of the plaintiffs, is a Wisconsin resident. (Defendant's Proposed Findings of Fact ["DPFF"] ¶ 2; Plaintiffs' Proposed Findings of Fact ["PPFF"] ¶ 1.) The other plaintiff, Access International Markets ["Access"], is a Wisconsin corporation engaged in the distribution of products, including water conditioning products. (DPFF ¶ 3; PPFF ¶ 2.) The defendant, William R. Hague, Inc. ["Hague, Inc."], is an Ohio corporation engaged in the manufacture of, among other things, a water conditioning product called the WaterBoss. (DPFF ¶ 1.)

Hague, Inc. entered into two agreements with Michael Sieren and his company, WaterBoss International Marketing, Inc. ["WaterBoss, Inc."] on October 13, 1989. The first,

the Sales and Marketing Agreement, made Mr. Sieren and WaterBoss, Inc. responsible for the sales and marketing of the Water-Boss product in North America. (DPFF ¶ 6.) The second contract, the Distribution Agreement, made Mr. Sieren and Water-Boss, Inc. the exclusive distributor of the WaterBoss product in Europe, and, later, in other markets including the Pacific Rim countries and Latin America. (DPFF ¶ 7.) The Distribution Agreement renewed year to year, absent a default. Hague, Inc. did not begin manufacturing the WaterBoss products until 1991. Hague, Inc. and Mr. Sieren agreed that the first year under both agreements was the fiscal year ending January 31, 1993. (PPFF ¶ 12.)

Mr. Sieren and WaterBoss, Inc. did not have their own international distribution network. (PPFF ¶ 17.) In 1991, Access contracted with WaterBoss, Inc. to sell Water-Boss products in the international market. The contract was renewed in 1997. (PPFF ¶ 13.) At all material times, Mr. Shank and Access acted as international sales representatives for Mr. Sieren and WaterBoss, Inc. regarding the sales and distribution of the WaterBoss. (PPFF ¶ 9.)

Mr. Shank procured international distributors and sales representatives. (PPFF ¶¶ 19–20.) One sales representative was C.O.B. International S.A.R.I. ["C.O.B."] in France, which obtained several dealer agreements throughout Europe. (PPFF ¶¶ 19, 21.) Mr. Shank had prior dealings with C.O.B.'s owner, Joel Cobigo, when both had worked for another corporation. (PPFF ¶¶ 26–27.) Another sales representative was Francisco Tort, who was the plaintiffs' Latin American representative for two years. (PPFF ¶ 29.)

As of June 30, 1997, there were three distributors in Japan, one in Taiwan, two in Korea, one in Italy, one in the United Kingdom, one serving the Baltic countries, two in Russia, one in Poland, one in Chile, one in Mexico, and one in Ireland. (PPFF ¶ 35.) Mr. Shank and Access spent years and substantial sums fostering the distribution network. Mr. Shank intended that the network would distribute products other than, or in addition to, the WaterBoss products. (PPFF ¶¶ 34–36, 38, 157.)

The sales representative and the distributors executed contracts with WaterBoss, Inc. (PPFF ¶ 49; DPFF ¶ 11.) In practice, however, the sales representatives and all distributors reported directed to and took directions directly from Mr. Shank and Access. (PPFF ¶ 53.) Mr. Shank prepared customer invoices, received purchase orders and prepared shop assembly instruction sheets, which gave Hague, Inc. directions on how to build products to customers' specifications. (PPFF ¶ 56.) Mr. Shank and Access delivered the purchase orders, assembly instructions, and other instructions directly to Hague, Inc. (PPFF ¶ 57.) Mr. Shank and Access hired and fired international representatives and distributors. (PPFF ¶ 58.) The representative and distributors would primarily contact Mr. Shank and Access, and would only secondarily contact Mr. Sieren or WaterBoss, Inc. (PPFF ¶ 67.) Neither Mr. Sieren nor WaterBoss, Inc. had any substantive role in the distribution network's activities. (PPFF ¶¶ 54–55.)

At all material times, the defendant dealt with Mr. Shank and Access as Hague, Inc.'s foreign sales manager. (PPFF ¶ 69.) Hague, Inc. never expressed to Mr. Sieren or Mr. Shank that it considered Mr. Shank and Access to be subagents or employees of WaterBoss, Inc. (PPFF ¶ 73.) Hague, Inc. and Mr. Shank directly communicated regarding customer orders, customer payments, and commission issues. (PPFF ¶ 81.) The Distribution Agreement provided that upon Hague, Inc.'s receipt of payment from a customer, it would pay Mr. Sieren and Water-Boss, Inc. the difference between the cost of the product plus 30 percent, and the sale price of a product. (PPFF ¶ 86.) Mr. Sieren and WaterBoss, Inc. would then pay Access from the sums received from Hague, Inc. (PPFF ¶ 87.) Access then would pay the sales representative from the sums received from Mr. Sieren and WaterBoss, Inc. (PPFF ¶ 88.)

Hague, Inc. terminated the Marketing and Sales Agreement on March 12, 1997. (PPFF ¶ 91.) Hague, Inc. did not terminate or threaten to terminate the Distribution

Agreement at that time. (PPFF ¶ 93.) In a August 20, 1997 letter to Hague, Inc., Water-Boss, Inc. asked about the status of the Distribution Agreement. (PPFF ¶ 96.) In a September 25, 1997 letter written by its attorneys, Hague, Inc. stated that it would not renew the Distribution Agreement beyond its October 13, 1997 anniversary date. (PPFF ¶ 97.) The letter refers to Hague, Inc.'s belief that the Distribution Agreement terminated in June, 1997 when Mr. Sieren and WaterBoss, Inc. filed a lawsuit against Hague, Inc. (PPFF ¶ 98.) The other lawsuit is also pending in this court.

After Hague, Inc. terminated the Marketing and Sales Agreement, it began delaying its payments under the Distribution Agreement. (PPFF ¶ 108.) In April, 1997, Mr. Sieren and Mr. Shank learned that Hague, Inc. was withholding certain payments under the Distribution Agreement for, among others, the distributor in Italy. These payments were subsequently released. (PPFF ¶ 109.) Mr. Shank and Access continued to make international sales of the WaterBoss and related products until October 1, 1997. (PPFF ¶ 110.) Hague, Inc. did not object to, and accepted, these sales. (PPFF ¶ 111.) Hague, Inc., however, stopped paying commissions on these sales. (PPFF ¶ 112.)

In a July 7, 1997 letter to Mr. Shank, David Hague, the defendant's vice-president, wrote that "we do wish to maintain our strong business relationship with you and others," that "[y]ou can expect to hear from us in the future," and that "I can assure you that you will no longer experience the same problems as in the past." (PPFF ¶ 135.)

Hague, Inc. then told the distributors that WaterBoss orders would be handled directly through the WaterBoss factory. (PPFF ¶ 137.) For example, in a July 31, 1997 letter to the distributors in Ireland and the United Kingdom, Hague, Inc. directed that "any questions or orders should now be addressed directly to the factory." (PPFF ¶¶ 140–41.) On July 31, Joel Cobigo, the owner of C.O.B., the international sales representative, sent a letter to WaterBoss, Inc. terminating its distribution contract. (PPFF ¶ 144.) Mr. Sieren received that letter on or about August 7, 1998. (PPFF ¶ 146.) C.O.B. now works directly for Hague, Inc. (PPFF ¶ 147.) Hague, Inc. did not send Mr. Shank copies of the letters referred to above. (PPFF ¶ 149.) Hague, Inc. eventually refused to accept any orders from Mr. Shank, Access, Mr. Sieren, or WaterBoss, Inc. (PPFF ¶ 153.)

Mr. Shank and Access have set forth two claims against the defendant. The first is for Hague, Inc.'s alleged tortious interference with the plaintiffs' actual and prospective contractual and business relationships with its sales representatives and sub-distributors. The second claim is for Hague, Inc.'s alleged tortious interference with the plaintiffs' contract and business agreement with Mr. Sieren and WaterBoss, Inc.

## II. Summary Judgment Standard

A motion for summary judgment will be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. Only disputes over facts that are outcome determinative under the applicable substantive law are considered to be material and will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Patel v. Allstate Ins. Co.,* 105 F.3d 365, 370 (7th Cir.1997).

The standard summary judgment procedure is that a summary judgment movant identifies for the court, "with reference to the record and to the law," the portions of record that show that no genuine issues of material fact exist. *See Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 979 (1996); *Major Mat Co. v. Monsanto Co.,* 969 F.2d 579, 582 (7th Cir.1992). Once the movant does this, the non-movant must produce evidence beyond the pleadings to show that there are indeed genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Logan,* 96 F.3d at 979. In resolving the motion, the court must then view the record, and any reasonable inferences drawn therefrom, in the light most favorable to the non-

moving party. *Griffin v. City of Milwaukee,* 74 F.3d 824, 826–27 (7th Cir.1996).

### III. Analysis

#### A. Tortious Interference with "Distribution Networks"

■ One of the plaintiffs' causes of action is for the defendant's tortious interference with the plaintiffs' actual and prospective contracts and business relationships with the international sales representative and distributors. None of the parties dispute, at least for purposes of the summary judgment motion, that Wisconsin law applies. Indeed, both parties rely almost exclusively on Wisconsin law. The court of appeals for the seventh circuit has noted that Wisconsin "recognizes as a cause of action the tortious interference with existing and prospective contractual relations." *Duct–O–Wire Co. v. U.S. Crane, Inc.,* 31 F.3d 506, 509 (7th Cir. 1994). To satisfy the elements of this cause of action, Mr. Shank and Access must prove that: (1) they "had an actual or prospective contract with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere." *Id.*

The defendant's argument is that the plaintiffs cannot prove that a contract or prospective contract existed between the plaintiffs and the sales representatives and distributors. It is undisputed, Hague, Inc. says, that the sales representatives and the distributors had agreements with Mr. Sieren and WaterBoss, Inc., not with Mr. Shank and Access.

#### 1. Oral Agreements

■ The plaintiffs' first response is that Access had "direct oral agreements with many representatives and distributors." (Pls.' Brief in Opposition to Def.'s Mot. for Summary Judgment, at p. 8.) These oral agreements, the plaintiffs' claim, are enough to satisfy their burden of proving the first element of their tortious interference claim.

■ While oral agreements may be enough to show that there was a "contract" between a tortious interference plaintiff and a third party, Mr. Shank and Access have not provided enough evidence that such oral agreements did indeed exist in this case. Indeed, the plaintiffs' only reference to the record is to the paragraphs in Mr. Shank's affidavit in which he lists the distributors with whom he had oral agreements. In this affidavit he states that he had "oral agreements with the members of this distribution network that they would act as my and my company's representative/distributors, not just for WaterBoss products, but for other product lines which my company would distribute in the future." Mr. Shank also states in his affidavit that he had "oral agreements with this network that I was in charge of the network and that they would take directions from me, not Sieren or WaterBoss Marketing." (Shank Aff. ¶¶ 6, 24.) Mr. Shank has not provided the affidavit of any of the distributors or representatives with whom he claim that he had an oral agreement. A plaintiff's self-serving affidavit that has no factual support cannot defeat a motion for summary judgment. *See Patterson v. Chicago Ass'n. for Retarded Citizens,* 150 F.3d 719, 724 (7th Cir.1998). The plaintiffs have not created a genuine issue of material fact on the question of whether they had oral agreements with the distributors.

#### 2. Novation

■ The plaintiffs' second response to Hague, Inc.'s argument is that the plaintiffs' assumed Mr. Sieren's and WaterBoss, Inc.'s rights under the agreements with the distributors and that this amounts to a novation of those agreements. A novation is when "there is an agreement between the obligor, obligee and a third party by which the third party agrees to be substituted for the obligor and the obligee assents thereto, the obligor is released from liability and the third person takes the place of the obligor." *Brooks v. Hayes,* 133 Wis.2d 228, 245, 395 N.W.2d 167 (1986). Under the plaintiffs' analysis, Mr. Sieren and WaterBoss, Inc. are the "obligors," Mr. Shank and Access are the "third persons," and the representatives and distributors are the "obligees."

One problem with the plaintiffs' assertion is that they have not shown that Mr. Sieren and WaterBoss, Inc., as the obligors, had

been released from all liability on their contracts with the distributors and the sales representative. There is no assertion, for example, that Mr. Sieren and WaterBoss, Inc. would not have been liable to the representatives and distributors if it did not pay Access and Mr. Shank their commission, the commission from which the plaintiffs' subsequently paid the distributors and representatives. In his affidavit, Mr. Shank states that while the representatives and distributors primarily contacted him, they would "secondarily" contact Mr. Sieren and WaterBoss, Inc. (Shank Aff ¶ 30.) It is unclear why, if there had indeed been a novation, the distributors would have had to contact Mr. Sieren and WaterBoss, Inc. at all.

Furthermore, both Mr. Shank and Mr. Sieren state in their affidavits that while the representative and some distributors executed contracts with WaterBoss, Inc., they "agree that the contracts really were with" Access and not WaterBoss. (Shank Aff. ¶ 24; Sieren Aff. ¶ 8.) This statement does not satisfy the court that there had been a legal "substitution" of the contracts that WaterBoss had indeed executed. For example, the defendant has provided the court with a contract signed by a French distributor and Mr. Sieren. (Schill Decl., Ex. 2.) That contract is dated November 17, 1996, five years after Access had contracted with WaterBoss, Inc. to manage the distribution network. The plaintiffs have not explained why, if the contracts really were with Access, Mr. Sieren continued to sign them on WaterBoss's behalf.

■ Another problem with the plaintiffs' novation argument is they have not proved that the "obligees," the sales representative and distributors, assented to the alleged substitution of parties to the contract. It is true that "[a]cceptance of the terms of novation may be implied from the facts and conduct of the parties in relation thereto." *See Siva Truck Leasing, Inc. v. Kurman Distribs.*, 166 Wis.2d 58, 68, 479 N.W.2d 542 (Ct.App. 1991). The facts as set forth by the parties, however, fail to convince me that the representative and distributors accepted the plaintiffs' claim that there had been a complete substitution. For example, if C.O.B., the

primary sales representative, accepted the substitution, it is unclear why it sent a letter to *WaterBoss, Inc.* when it terminated its distribution contract. (PPFF ¶ 144.) Also, as I described above, the distributors still continued to contact Mr. Sieren and WaterBoss, Inc. throughout the years.

### 3. Substantial Relationship With Distribution Network

■ The plaintiffs' final response to the defendant's argument regarding the distribution network is that their relationship with the representative and the distributors was enough for them to succeed on their intentional interference claim. They bring up three separate points in making this argument.

The first point I will address is Hague, Inc.'s alleged interference with the plaintiffs' *existing* relationship with the distribution network. Calling the defendant's argument "hypertechnical," Mr. Shank and Access claim that their substantive relationship with the network meets the legal requirement. As stated above, however, Wisconsin clearly requires a showing of a "contract with a third party." *Duct–O–Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509 (7th Cir.1994). As previously discussed, Mr. Shank and Access simply have not shown that there has been such a contract between them and the distribution network.

The plaintiffs also claim that Hague, Inc. should be liable for its intentional interference with the *prospective* contracts that the plaintiffs would have had with those in the distribution network. Specifically, the plaintiffs refer to Mr. Shank's intention that he would eventually contract with the distributors and representative to distribute products other than or in addition to the WaterBoss product. The Wisconsin court of appeals has recognized the right for a plaintiff to recover for the "intentional interference with another's prospective contractual relation." *See Cudd v. Crownhart*, 122 Wis.2d 656, 658–59, 364 N.W.2d 158 (Ct.App.1985).

■ Although intentional interference with a prospective contract with a third party

may be a tort that is separate from interference with an actual contract, *Duct–O–Wire* still requires the plaintiff to at least show that there was a prospective contract with the third party. *See* 31 F.3d at 509. Mr. Shank's self-serving statement that he intended to contract with the distributors is not enough to satisfy his burden. The plaintiffs have not pointed to anything else in the record that would allow me to find that the plaintiffs and the third parties, for example, had been engaging in negotiations or had agreed to distribute other products. *See Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 337 (7th Cir.1991) ("[A] plaintiff's speculation is not a sufficient defense to a summary judgment motion.").

▌ The plaintiffs' third point is that they only need to show that they have, or will have, *economic relations* with the third parties, not that there exists an actual or prospective contract or agreement. In short, they propose that there is another, separate tort: tortious interference with actual or prospective business relations. The plaintiffs have not convinced me that I should recognize this tort in this case. Wisconsin state courts and federal courts sitting in this state have made passing reference to economic or business relations, but always in the context of there being at least sufficient evidence of a prospective *contract* between the plaintiff and the third party.

For example, the Wisconsin court of appeals very recently stated that Wisconsin "recognize[s] the tort of interference with prospective economic relations." *Anderson v. Regents of University of California,* 203 Wis.2d 469, 490, 554 N.W.2d 509 (Ct.App. 1996) In the next paragraph, however, the court said that the first element of that tort is "a prospective contractual relationship on behalf of the plaintiff." *Id.*

Judge Warren of this district addressed a tortious interference claim in which he stated the plaintiff "must have had a contract or a prospective contractual relationship with a third party." *Select Creations, Inc. v. Paliafito America, Inc.,* 911 F.Supp. 1130, 1156 (E.D.Wis.1995). Although the heading of this section of Judge Warren's decision asked "Was There a Contract or Prospective Eco-

nomic Relationship?," he emphasized that there were in fact both existing and prospective contracts between the plaintiff and the third party. *Id.* In *Select Creations,* unlike those in the case at bar, the third party already had purchase orders with the plaintiff, which the court found to be "binding contracts," and that they "had a sufficiently certain, concrete and definite prospective relationship" with the plaintiff regarding the items listed in those purchase orders. *Id. Select Creations,* therefore, is not a case in which the court found that economic or business relations, standing alone, were enough to create a cause of action for tortious interference.

Moreover, in referring to the "prospective relationship," Judge Warren cited *Sampson Investments v. Jondex Corp.,* in which the Wisconsin supreme court said that "[e]ven where there has been no breach of a contract, a plaintiff seeking to maintain a claim for tortious interference with contract must show *some specific right* which has been interfered with." 176 Wis.2d 55, 73, 499 N.W.2d 177 (1993) (emphasis added). The state supreme court said that because the plaintiff could not show that it had the right to require the third party to perform, the plaintiff could not maintain a cause of action. The court concluded that, "[i]n fact, allowing [the plaintiffs'] claim would grant them rights which the parties did not bargain for. The inability to show any right which was interfered with is fatal to [the plaintiffs'] tortious interference claim." *Id.* (emphasis in original). Because *Sampson* required more than a "relationship" between the plaintiff and the third party, it cannot be (and has not been) cited for the position that there exists a tort for intentional interference with business relations. At the least, the plaintiff must have some right to require the third party to perform or to continue in the relationship.

The plaintiffs do cite some cases for their position, but, like the cases above, those cases do not support the plaintiffs' argument. In *Purtell v. Tehan,* the Wisconsin supreme court quoted the now-replaced Restatement of Torts for the proposition that it is a tort for someone to cause a third person not to "enter into or continue a business relation

with another." 29 Wis.2d 631, 638, 139 N.W.2d 655 (1966) (quoting Restatement of Torts § 766). The *Purtell* court noted, however, that the existence of a "valid contract" between the plaintiffs and the third party was "an essential prerequisite to their complaint stating a cause of action." *Id.* at 635, 139 N.W.2d 655. Another case that the plaintiffs rely on cites the same Restatement of Torts section as the *Purtell* court, but only for the proposition that " 'one who, *without a privilege to do so,* induces or otherwise purposely causes a third person not to perform a contract with another ... is liable to the other for the harm caused thereby.' " *Mendelson v. Blatz Brewing,* Co., 9 Wis.2d 487, 491, 101 N.W.2d 805 (1960) (emphasis and alterations in original). The *Mendelson* case also explicitly refers to a "contract."

The plaintiffs also quote the following statement by the court of appeals for the seventh circuit: "The Wisconsin Supreme Court has long recognized a right of action for tortious interference with advantageous economic relations. ..." *Federal Pants, Inc. v. Stocking,* 762 F.2d 561, 568 (7th Cir.1985). The *Federal Pants* court, however, went on to say that under this theory, it is the plaintiff's burden of showing "intentional interference with *existing contractual relations.*" *Id.* at 569 (emphasis added). Moreover, in making the statement about "advantageous economic relations," the only case that the court of appeals referred to was a case in which there was an existing contract between the plaintiff and the third party. *See Chrysler Corp. v. Lakeshore Commercial Fin. Corp.,* 389 F.Supp. 1216, 1219 (E.D.Wis. 1975), *aff'd,* 549 F.2d 804 (7th Cir.1977) (unpublished).

Mr. Shank and Access have failed to create a genuine issue of material fact on the question of whether their relationship with their distribution network rose to such a level that it is protected by the tort of intentional interference. While there is no dispute that the plaintiffs' had a beneficial relationship with the distributors and representative, they have not proved that they had a bargained-for right to expect these relations to continue into the future. Mr. Shank's statement that he expected that the distribution network

would continue to work for him is simply not enough to survive summary judgment. Mr. Shank and Access have also not proved that their relations with the distribution network were "sufficiently certain, concrete and definite," *see Select Creations,* 911 F.Supp. at 1156, or that it had "the potential to ripen into a full contractual relationship," *see Aydin Corp. v. Loral Corp.,* 718 F.2d 897, 904 (9th Cir.1983). As a result, I will grant Hague, Inc.'s motion for summary judgment as to the plaintiffs' claim for tortious interference with their contractual and business relations with the distribution network.

### B. Tortious Interference with Mr. Sieren and WaterBoss, Inc.

Hague, Inc. also contends that the plaintiffs' cannot support their claim that the defendant tortiously interfered with the plaintiffs' contract with Mr. Sieren and WaterBoss, Inc.

The defendant argues that this tortious interference claim cannot stand because any damages that the plaintiffs may have suffered stem only from Hague, Inc.'s conduct regarding its contract with Mr. Sieren and WaterBoss, Inc. As a result, the defendant argues, the plaintiffs "seek merely to recover incidental damages allegedly flowing from a breach of contract" between the third parties and Hague, Inc. (Def.'s Br. in Support of Mot. for Summary Judgment, at p. 8.)

Hague, Inc. primarily relies on a case from New York for its proposition. In that case, the plaintiff, a sublicensee, sued the defendant for tortiously interfering with the plaintiff's sublicense contract with the third party. *Artwear, Inc. v. Hughes,* 202 A.D.2d 76, 615 N.Y.S.2d 689 (N.Y.App.Div.1994). The plaintiff in *Artwear* said that the defendant was liable because it had breached its own contract with the third party, and as a result, the third party was unable to perform under the sublicense agreement. *Id.* at 694. The New York court described one of the elements of a tortious interference claim as "the defendant's intentional procurement of the third party's breach of the contract without justification." *Id.* The *Artwear* court then said the claim failed because the plaintiff had not alleged that the defendant had induced a

breach of the sublicense agreement or that there was even a breach of the sublicense agreement. Because the plaintiff had only alleged that it suffered damages because of the defendant's breach of its own contract with the third party, which according to the court, was "nothing more than a claim for damages incidentally flowing from the breach of the license agreement." *Id.* at 694–95.

There is a substantial difference between the *Artwear* case and the case at bar. In *Artwear*, the court required that there actually be an allegation that there was a breach of the contract between the plaintiff and the third party. Wisconsin law, however, does not require that a defendant in a tortious interference case actually have caused a breach of the contract, but only that the defendant interfered with the relationship. *See Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509 (7th Cir.1994). The Wisconsin court of appeals recently said that a defendant who interferes with the performance of a contract is liable when the "interference either prevents the performance of the contract, or causes the other's performance to be more expensive or burdensome." *Magnum Radio, Inc. v. Brieske*, 217 Wis.2d 130, 577 N.W.2d 377, 380 (App.1998).

Despite this less stringent standard, I do not believe that Mr. Shank and Access have created a genuine issue of material fact as to whether Hague, Inc.'s conduct interfered with the plaintiffs' ability to perform under their contract with Mr. Sieren and WaterBoss, Inc. or whether it made the plaintiffs' performance more expensive or burdensome. The plaintiffs claim that they have alleged more than that Hague, Inc.'s breach of its contract with Mr. Sieren and WaterBoss, Inc. injured them. Because their contract with Mr. Sieren and WaterBoss, Inc. "required them to develop and maintain an international distribution network," and because Hague, Inc. destroyed the network, the plaintiffs contend that Hague, Inc. caused the plaintiffs' to be unable to perform their contractual promise to Mr. Sieren and Water-Boss, Inc. (Pls. Resp. Brief to Def.'s Mot. for Summary Judgment.)

The flaw in the plaintiffs' argument is that they point to nothing in the record that shows what exactly their obligations under their contract with Mr. Sieren and Water-Boss, Inc. were or how they were unable to perform these obligations. Despite the plaintiffs' claim in their brief that they had an obligation to *maintain* the distribution network, there is nothing in the record to support this statement. The plaintiffs have provided the most recent agreement between Mr. Shank and Mr. Sieren, but they have not pointed to the part that they have failed to perform. Furthermore, the only evidence that the plaintiffs give regarding the interference with the contract is Mr. Shank's bald statement in his affidavit that "Hague's conduct prevented me and my company from performing under the agreement with Sieren and Waterboss Marketing." (Shank Aff. ¶ 65.)

There is simply not enough for the court to find that there is a genuine issue of material fact. Hague argued that the plaintiffs have failed to show the absence of a separate breach of the contract between them and Mr. Sieren and WaterBoss, Inc. While the plaintiffs did not need to show that there was indeed a breach, they at least had to show how the defendant's conduct *interfered* with the contract between the plaintiffs and Mr. Sieren and WaterBoss, Inc. It was the plaintiffs' burden to direct the court to the record to show that there was indeed a genuine issue of material fact. The plaintiffs failed to do that here.

Therefore, IT IS ORDERED that the defendant's motion for summary judgment be and hereby is granted, with costs.

IT IS ALSO ORDERED that this action be and hereby is dismissed, with prejudice.